A. G. HEGBERG, Administrator, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, May 6, 1912.

1. RAILROADS: Escaping Cars: Negligence: Contributory Negligence: Jury Question. In an action against a railroad company by an administrator for damages for the alleged negligent killing of his intestate, who at the time of his death was a brakeman on a freight train, engaged in switching cars and who was killed on account of a collision caused by freight cars escaping from a side track because they had not been properly blocked and the brakes set; the evidence is examined and *held* that the question of defendant's negligence and deceased's contributory negligence were for the jury and that the court properly overruled defendant's demurrer to the testimony.

2. MASTER AND SERVANT: Safe Place to Work: Continuous Duty. The duty of the master to furnish the servant a reasonably safe place in which to work is not discharged by furnishing such place at the beginning of the servant's work, but the master is required to use ordinary care to see that the place continues in a reasonably safe condition, the duty being a continuous one and non-delegable.

3. **RAILROADS: Escaping Cars: Blocking Cars: Master and Servant: Duty of Master.** A railroad company owes the duty to its servants employed in the handling of trains to use reasonable care to have its cars left on a side track properly blocked and braked, so as to prevent said cars from escaping.

4. **————: ————: ————: ————: ————: Presumption: Res Ipsa Loquitur.** Where cars left on a side track get loose and injure a servant in the due performance of his duty, the presumption will be raised that the master did not use reasonable care to hold the cars on the side track and the burden would be upon the master to prove that he performed his duty in this respect.

5. **APPEAL AND ERROR: Evidence: Preserving Diagram in Record.** Where a witness was examined with a map or diagram of the scene of the accident, but the appellant did not preserve such map or diagram in the record presented to the appellate court and the testimony standing alone is unintelligible, the appellant will not be permitted to draw unfavorable inferences from such testimony.

6. **PRACTICE: Demurrer to Evidence: Jury Question.** In considering a demurrer to the evidence, where the evidence is susceptible to two inferences, one consistent with ordinary care and the other tending to show negligence, the question is one of fact for the jury.

7. **————: ————.** A demurrer to the evidence admits every fact of plaintiff's case to be true which the evidence tends to prove.

8. **BURDEN OF PROOF: Prima Facie Case: Oral Testimony: Jury Question.** Where the plaintiff has the burden of proof and has made out a prima facie case by oral evidence and though plaintiff's witnesses are uncontradicted and defendant offers no evidence at all, the court has no right to direct a verdict but the defendant is entitled to have the jury pass on the credibility of the witnesses. This rule is applied in a case where defendant contended that the oral evidence established the contributory negligence of plaintiff.

9. **RAILROADS: Escaping Cars: Contributory Negligence: Servant Selecting Dangerous Method: Violating Rules of Company.** Plaintiff's decedent was killed on account of cars escaping from a side track and colliding with an engine. The deceased, who was a brakeman and was assisting in uncoupling and switching cars, had jumped on the pilot of the engine at the time of the accident. Defendant contended that deceased was guilty of contributory negligence in having failed to block and brake the cars that escaped, in selecting a dangerous method of uncoupling the cars and in violating the rules of the company

by jumping on the pilot of the engine. *Held*, under the evidence that plaintiff's contributory negligence was for the jury and that the instructions given on that question correctly declared the law.

10. **RAILROADS: Master and Servant: Violating Rules: Tacit Consent of Officers: Contributory Negligence.** Although a railroad company had posted rules forbidding the uncoupling of cars by getting on the pilot or between the cars while the uncoupling took place, if the company's officers knew of the violation of the rule and with their tacit consent have allowed the same to be habitually violated, an employee in pursuing the usual method of uncoupling the cars would not be guilty of contributory negligence as a matter of law.

11. **DEATH BY WRONGFUL ACT: Compensatory Damages: Evidence: Parents' Loss of Son.** In an action by an administrator for the wrongful death of his decedent, a single man, who was killed by the cars while employed as a brakeman for defendant, it was *held* competent for the father to testify as to the earnings of the deceased and the amount of money he had furnished his parents during his lifetime and their dependence upon his earnings for support, following the holding of the Supreme Court in Boyd v. Railroad, 139 S. W. 561.

12. **EVIDENCE: Objections: Practice.** A party objecting to testimony is not required to keep up a running fire of objections throughout the entire examination. In this case the defendant's objections are *held* to have been sufficiently well timed and numerous enough to meet all the requirements of the law.

13. **DEATH BY WRONGFUL ACT: Statutory Actions: Action Based on Particular Statute.** In an action under the damage act for the wrongful death of a party resulting from the negligence of the peculiar character specified in section 5425, Revised Statutes 1909, the aggrieved plaintiff must sue under that section and does not have the option of suing under sections 5426 and 5427. These are purely statutory rights and must rest each upon its own statute.

14. ———: ———: ———: **Railroads.** If the servants and agents of defendant railroad company killed the deceased under circumstances such as to create a liability under section 5425, Revised Statutes 1909, necessarily defendant is not liable for such killing under any other sections; contra, if the servants and agents of the defendant killed the deceased under circumstances making defendant liable under any other section of the statute than 5425, such defendant is necessarily not liable under such section.

15. ———: ———: ———: **Pleading.** In an action under the damage act for the wrongful death of a party, resulting from

Hegberg, Admr., v. Railroad.

defendant's negligence, it is not necessary for the pleader to designate under which of the sections his action is brought, nor would such designation, if made, be conclusive as to which section the liability would be based upon.

16. ———: ———: ———: ———. In an action by an administrator for the wrongful death of his decedent, a brakeman, alleged to have been caused through defendant's negligence, the plaintiff contended that his petition was drawn under sections 5426 and 5427, Revised Statutes 1909. His evidence was given, the instructions drawn and the trial conducted on that theory. The defendant contended that the suit is prosecuted under section 5425, Revised Statutes 1909. *Held*, that plaintiff's cause of action was in fact for a liability under section 5425 and that the petition stated the necessary constituent facts in such a case as to apprise defendant that plaintiff was prosecuting under section 5425.

17. ———: ———: ———: Death from Operating Train: Time of Negligent Act. The general purpose of section 5425, Revised Statutes 1909, is to allow damages for wrongful death, resulting from the negligent acts of servants or employees engaged in running, conducting or managing public conveyances, controlled mostly by common carriers; it requires that the negligence of defendant's employees must have concurred in point of time with the movement or operation of its cars, but not that the negligence must have occurred in point of time with the infliction of the injuries caused the death.

18. NEGLIGENCE: Time of Negligent Act: Proximate Cause. Under the general rule of actionable negligence while the injuries may not immediately follow the negligent act, it must appear that the injuries were the natural and proximate consequence of the negligence and might and ought to have been foreseen by a reasonably prudent man in the light of all the attendant circumstances.

19. DEATH BY WRONGFUL ACT: Suit by Administrator: Action Not for Benefit of Estate. An administrator prosecuting an action under section 5425, Revised Statutes 1909, for the wrongful death of his decedent, cannot sue for the benefit of the estate, there being no such statutory provision, but he sues as the personal representative of the distributees who would be entitled to the decedent's real and personal property under the laws of descent and distribution.

20. STATUTORY CONSTRUCTION: Giving Effect to Every Word. A familiar canon of statutory construction is that every word of the statute, where it can be consistently done, is to be given force and effect, especially if they are in harmony with the legislature's intention as collected from the entire act.

21. **DEATH BY WRONGFUL ACT: Compensatory Damages: Rule for Estimating Damages.** In estimating the amount of compensatory damages, if any are allowed under section 5425, Revised Statutes 1909, it would seem proper to apply the rule given by section 5427, that is, that such an amount shall be allowed as the jury may deem fair and just with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue.

22. ————: ————: ————. The beneficiaries provided for by the fourth clause of section 5425 are not generally dependent upon the deceased and it is only in those cases where they have in fact been receiving pecuniary assistance and then only to the extent of a fair and just estimate of their loss that they could recover compensatory damages under said section.

23. ————: ————: **Distribution of Amount Recovered.** In an action under section 5425, Revised Statutes 1909, for the wrongful death of plaintiff's decedent, the beneficiaries were those provided for by the fourth clause of said section. *Held*, that the amount recovered would go to the father, mother, brothers and sisters of the deceased and their descendents in equal parts, although the father and mother were the only ones who suffered pecuniary loss.

24. **INSTRUCTIONS: Negligence: Contributory Negligence.** In an action by an administrator to recover damages for the wrongful death of his decedent, who was killed by a collision resulting from the escape of cars that had been stored on a side track, and which were not properly blocked and braked, an instruction is criticised because it confined the duty of fastening the cars to the day of the accident and it further failed to require a finding of negligence of the agents, servants and employees of the defendant, other than the deceased.

25. ————: **Must be Intelligible.** It is important that instructions to the jury should be intelligible and couched in plain and unequivocal language so as to be readily understood by them.

26. **WORDS AND PHRASES: Unmarried: Pleading.** An allegation in a pleading that a person is single and unmarried does not necessarily mean that such person was never married, but ordinarily and especially after verdict the word "unmarried" would properly be *held* to mean that the party had never been married.

27. **DEATH BY WRONGFUL ACT: Action by Administrator: Pleading: Allegation Concerning Children.** In an action under section 5425, Revised Statutes 1909, to recover for the wrongful death of plaintiff's decedent, an allegation that deceased was single and unmarried would be a sufficient allegation that he

left no natural children, but not a sufficient statement from which it would naturally be inferred that he did not leave surviving him an adopted child or children.

28. **PARENT AND CHILD: Adopted Children: May be Adopted by Unmarried Person.** The general law is that where the statute does not make any restrictions, an unmarried person may legally adopt a child.

29. **DEATH BY WRONGFUL ACT: Pleading.** In statutory actions to recover for the wrongful death of a person the party suing must bring himself strictly within the statutory requirements necessary to confer the right and they must appear in his petition, otherwise it shows no cause of action.

30. **PLEADING: Failure to State Cause of Action: Always Open to Review.** A petition that does not state a cause of action is always open for review at every stage of the case, at any time, in any court, whether raised by demurrer or not.

31. **APPEAL AND ERROR: Reviewing Record.** Section 2083, Revised Statutes 1909, has made it the duty of the appellate court, independent of any action of the attorneys, to examine the record and if any error is apparent on the face of the record to reverse the judgment *sua sponti*, whether any exceptions are taken or not.

32. **VERDICT: Excessive: Death by Wrongful Act.** In an action by an administrator to recover damages for the wrongful death of plaintiff's decedent, COX, J., in a separate opinion concurs in reversing and remanding the cause, but places his concurrence upon the ground that since the measure of damages that went to the jury was compensatory alone, the verdict of $7500 was excessive. It appeared that the mother and father of deceased were the only relatives who suffered pecuniary loss from the death.

32 **RAILROADS: Escaping Cars: Contributory Negligence: Instructions.** In an action for damages on account of the death of plaintiff's decedent, which resulted from a collision caused by the escape of cars stored on a side track, which had not been properly braked and blocked, *held,* in separate opinion by COX, J., concurred in by GRAY, J., that on the question of contributory negligence the jury should be instructed that if they should find from the evidence that it was the duty of the deceased to see that the cars left standing on the switch had sufficient breaks set to hold them in place while the switching was done and he failed to perform that duty, then plaintiff could not recover.

Appeal from Polk Circuit Court.—*Hon. C. H. Skinker*, Judge.

REVERSED AND REMANDED.

*W. F. Evans* and *John H. Lucas* for appellant.

(1) The evidence is insufficient to convict the appellant of the error assigned. 3 Elliot on Railroads (2 Ed.), sec. 1296, p. 720; Furber v. Bolt & Nut Co., 185 Mo. 301; Conovski v. Transit Co., 207 Mo. 263; Willikin v. Com. Co., 202 Mo. 637; Kennedy v. Railroad, 128 Mo. App. 297. (2) The evidence convicts the respondent of contributory negligence so as to preclude a recovery herein. Moore v. Railroad, 146. Mo. 582; 1 Bailey on Personal Injuries, sec. 1121; Brady v. Railroad, 206 Mo. 531; Pierson v. Railroad, 127 Iowa 13; Montgomery v. Railroad, 109 Mo. App. 88; Matthews v. Railroad, 227 Mo. 250; Neel v. Ryus, 130 S. W. 78; Railroad v. Kane, 118 Fed. 223; Rail road v. Caraway, 77 Ark. 405; Railroad v. Meyers, 95 Ill. App. 578; Fluhrer v. Railroad, 121 Mich. 212; Railroad v. Duwees, 153 Fed. 56; Van Camp v. Wabash, 141 Mo. App. 344. (3). The court erred in admitting incompetent evidence, viz: that of A. C. Hegberg, father of the deceased. Barker v. Railroad, 91 Mo. 91; Tetherow v. Railroad, 98 Mo. 84. (4) The court erred in giving instructions of its own motion herein and instructions on behalf of respondent, the same being erroneous, misleading, unsupported by evidence and calculated to confuse the jury. Instruction No. 2 enlarges the issues. Roscoe v. Railroad, 202 Mo. 587; Gibler v. Railroad, 148 Mo. App. 487; Gibson v. Bridge Co., 112 Mo. App. 594; Tinkle v. Railroad, 110 S. W. 1094; Wellmeyer v. Transit Co., 198 Mo. 544; Manser v. Botts, 80 Mo. 651. Is misleading: Belt v. Goode, 31 Mo. 130; Clark v. Kitchen, 52 Mo. 316; Waddington v. Hullett, 92 Mo. 535.

*Rechow & Pufahl, Hamlin & Seawell* for respondent.

(1) There was no error in overruling the demurrer and refusing the peremptory instruction. Smith v. Fordyce, 190 Mo. 1; Edge v. Railroad, 206 Mo. 471; Trust Co. v. Railroad, 87 Fed. 133; Au v. Railroad, 29 Fed. 72; 4 Thompson on Negligence (2 Ed.), secs. 4525, 4742; Railroad v. Johnson, 24 Tex. Civ. App. 180, 58 S. W. 622; Jones v. Railroad, 178 Mo. 528; Koenner v. Car Co., 209 Mo. 157; Browning v. Railroad, 124 Mo. 55. (2) The court did not err in refusing to declare deceased guilty of contributory negligence as a matter of law, nor was there any assumption of risk. Kennedy v. Railroad, 190 Mo. 442; Trust Co. v. Railroad, 87 Fed. 134; Brady v. Railroad, 205 Mo. 510; Francis v. Railroad, 127 Mo. 658; Barry v. Railroad, 98 Mo. 62; Hunter v. Railroad, 149 Mo. App. 243; Heine v. Railroad, 144 Mo. App. 443; Hamilton v. Coal Co., 118 Mo. 364; Eddington v. Railroad, 204 Mo. 61; Burdict v. Railroad. 123 Mo. 222; Murphy v. Railroad, 115 Mo. 111; Brannock v. Railroad, 147 Mo. App. 301; McGuire v. Railroad, 128 Mo. App. 677. (3) There was no error in the reception of evidence. Boyd v. Railroad, 236 Mo. 54, 139 S. W. 561; Williams v. Railroad, 141 Mo. App. 631; Philpott v. Railroad, 85 Mo. 164; King v. Railroad, 98 Mo. App. 235; Marsh v. Railroad, 104 Mo. App. 577; McKenzie v. Railroad, 216 Mo. 17; Schlereth v. Railroad, 115 Mo. 102; 4 Suth. Dam., sec. 1273, p. 3741; Johnson v. Railroad, 150 Mo. App. 322. (4) The instructions were squarely within the issues presented by the pleadings and evidence. Chouquette v. Railroad, 152 Mo. 263; Clowers v. Railroad, 21 Mo. App. 213; Smith v. Fordyce, 190 Mo. 213; Dutro v. Railroad, 111 Mo. App. 259; McDermott v. Railroad, 87 Mo. 286; Robinson v. Railroad, 133 Mo. App. 101; Browning v. Railroad, 124 Mo. 55; Boyd v. Railroad, 139 S. W. 570; John-

ston v. Railroad, 150 Mo. App. 322; Murphy v. Railroad, 228 Mo. 86; McKenzie v. Railroad, 216 Mo. 14; McCarty v. Railroad, 192 Mo. 400; Lee v. Railroad, 195 Mo. 428; Tetherow v. Railroad, 98 Mo. 86.

NIXON, P. J.—This is an action by the administrator of the estate of John Hegberg, deceased, for damages for the alleged negligent killing of his intestate (who was his brother). The deceased was in the employ of the defendant company as a brakeman on one of its freight trains and was killed in a collision which occurred at Willow Springs, Missouri, on the 12th day of July, 1910. This action is maintained to recover damages for the wrongful killing of the deceased under chapter 38 of the Revised Statutes of 1909 concerning damages in actions for torts. A trial was had in the circuit court of Polk county which resulted in a judgment for the plaintiff in the sum of $7500. The defendant has appealed.

The petition contains four counts. The second, third and fourth counts were eliminated as grounds of recovery by the instructions of the trial court and it is therefore unnecessary to set them forth in this opinion.

The first count of the petition (the one on which the trial was had) is as follows (formal parts omitted):

"The plaintiff for cause of action states that on the 27th day of August, 1910, he was by the probate court of Greene county, Missouri, duly appointed administrator of the estate of John Hegberg, deceased, and that he qualified as such and is now the duly and legally qualified and acting administrator of the estate of John Hegberg, deceased.

"That the defendant, St. Louis & San Francisco Railroad Company, is and was on the date hereinafter mentioned, a corporation duly organized and existing under and by virtue of the laws of the state of Mis-

souri, and owning and operating a railroad in said state and particularly through and into the counties of Wright and Webster of said state.

"That on the 12th day of July, 1910, the said John Hegberg was in the employment of the defendant as a brakeman, on one of its freight trains running from Springfield to Thayer, Missouri. That upon the arrival of said freight train at Willow Springs, Missouri, the said John Hegberg, together with the other members of the said train crew were ordered to make up a train at said place and run the same to Springfield, Missouri.

"That at said place in addition to the main track there is a side track and at said time there were six loaded and unloaded cars standing on the side tracks west of the main line track. That in making up said train for Springfield it was necessary to place a car from said side track onto the main line and in performing this work on account of the position of the car desired on the side track it was necessary to couple three of said cars to the engine and convey them to a switch south of the station house and kick the car desired onto the main track and the remaining cars, not desired for said train, would be run over the switch and kicked back on the side track.

"Plaintiff says that said side track west of the main line track upon which said loaded and unloaded cars were standing had a downward grade south and toward the switchstand and that it was the duty of the defendant and its agents, servants and employees who placed said cars on said track to see that the brakes on each of said cars were securely set and to securely set the brakes thereon and if there were any of the brakes that could not be so set to securely block the cars and each of them so that said cars nor any of them could break loose and escape and that it was the duty of the defendant and its conductor who was in charge of the train that was being made up after

certain cars were released or taken away to see that the brakes with the remaining cars were still securely set and if any of the brakes were not in good condition to see that such car or cars were securely blocked or otherwise fastened so that they could not break loose and escape and run over the side track south to the switch stand aforesaid:

"Plaintiff says that the defendant, its agents, servants, and employees disregarded their duty in this behalf and that prior to the injury to the deceased, six freight cars had been placed on the side track aforesaid and that the defendant, its agents, servants and employees negligently and carelessly failed to see that said cars were securely fastened and negligently and carelessly failed to securely fasten said cars and each of them negligently and carelessly failed to set the brakes on said cars and each of them and negligently and carelessly failed to securely block said cars and each of them and that the defendant and its conductor in charge of the train that was being made up as aforesaid and after certain cars were released to be taken away negligently and carelessly failed to see that the brakes on the remaining cars and each of them were still securely set and negligently and carelessly failed to see that said remaining cars and each of them were securely blocked or otherwise fastened so that they would be reasonably safe and not break loose and escape and run over the side track south to the switchstand aforesaid.

"Plaintiff says that after the cars aforesaid had been released the three remaining cars on said side track were not securely fastened nor securely blocked and that by reason thereof said side tracks with the remaining loaded cars thereon became unsafe and dangerous and said cars were likely to escape and run down southward to the switchstand and injure the employees of the defendant engaged at work at said place.

"Plaintiff says that in making up said train the deceased, John Hegberg, was ordered by the defendant, its agents and employees and it was his duty to assist in kicking cars onto the main line and back to the side track aforesaid and that while he was in the discharge of his duties and attempting to uncouple cars from the engine to be kicked back on the side-track the three loaded cars aforesaid on said side track through the negligence and carelessness of the defendant, its agents, servants and employees in the manner aforesaid escaped from their position and ran south on said track and collided with the cars at said switch and the said John Hegberg without fault or negligence on his part was crushed, mangled and killed.

"That at the time of his death he was single and unmarried and over the age of twenty-one years and that plaintiff by reason of the death of the said John Hegberg, aforesaid, through the negligence and carelessness of the defendant as aforesaid, has been damaged in the sum of ten thousand dollars for which amount he prays judgment."

The answer generally denies negligence, alleges contributory negligence, and pleads assumption of risk.

The following admissions of facts were made:

(1) The deceased was ordered to make up a train at Willow Springs for Springfield. (2) In addition to the main track at Willow Springs, there was a side track on which there were at the time in question six cars, some loaded and some unloaded. It was necessary to take a car from the side track to the main line, and in so doing it was necessary to couple three of the cars to the engine and convey them to a switch south of the station house, and kick the car desired onto the main track, and the remaining two cars, not desired, run over the switch and kicked back on the side track to their original position. (3) The side track had a downward grade south toward the switchstand.

The plaintiff's petition in substance charges that six of defendant's freight cars, part of which were loaded, were left standing on its side track at Willow Springs; that the side track at that place had a downward grade south toward the switch where deceased as an employee was required to perform his work; that a duty rested upon the defendant and its employees, when said cars were stored on the side track, to fasten and secure each of them so that they could not escape and roll down toward the switchstand, thereby rendering the place where the deceased and other employees were required to work insecure; that this duty was not performed and that the failure to so perform it caused the injury. The second ground of negligence charged is that it was the duty of the defendant and its conductor when picking up any of the cars stored on the side track at this place, when a train was being made up, to see that the remaining cars were properly secured by setting the brakes or by blocking the wheels so that when any cars were taken away those remaining could not escape, run down the side track, and injure defendant's employees.

Defendant contends, on the other hand, that at the time the cars were set out at Willow Springs on the side track, the only duty required of the company was to have enough of the hand brakes set to keep the string of cars from being blown out by the wind; and that when at any time subsequently any one or more of the several cars were to be released and taken away, in making up a train, and others left standing, it was the duty of its brakeman in charge of uncoupling the cars, before cutting any of the cars loose, to see that the remaining cars were secured by setting the brakes or blocking the wheels; that on the particular occasion of intestate's death he was the brakeman who uncoupled the three cars and failed to discharge his duty as brakeman by setting the brakes on the remaining

cars, and that such negligence contributed to cause his death.

The action of the trial court in overruling the defendant's demurrer offered at the close of all the evidence in the case presents the first important question for our consideration. The defendant having put in its evidence after its demurrer to plaintiff's evidence was overruled, the validity of the demurrer filed at the close of all the evidence is to be determined by all the evidence in the case.

The facts concerning the physical condition of defendant's side track whereon its cars were stored at Willow Springs were undisputed. The side track sloped to the switch, some six or seven hundred feet south, and when a string of cars were stored on it, unless the brakes were properly set or the wheels blocked, the cars were likely to escape and roll down grade south to the switchstand, and hence greater caution would be required in securing them in such a place than if they were placed on a level track. It is conceded that by reason of not being properly secured, three cars escaped from their position, rolled south on said side track, and collided with the cars on which deceased was at work, resulting in his death.

The law requires that the master use ordinary care to furnish his employee with a reasonably safe place in which to work, having regard to the danger of the service and the peril to which the employee will be exposed from failure to exercise such care; and this duty is not discharged by furnishing his servant a reasonably safe place at the beginning of the servant's work, but defendant is required to use ordinary care to see that the place is left in a reasonably safe condition, the duty being a continuing one and non-delegable. Besides this, an ordinarily prudent master in charge of the management of a railroad, would have known that in the ordinary transaction of the railroad business, cars were only stored

on the side track at Willow Springs temporarily, and that in the exigencies of the business, one or more of them were likely to be required to be cut loose from the others and put into use on the main line. It was further apparent that defendant, as a reasonably prudent master, should have anticipated that its servants in the discharge of their ordinary duties in the handling of freight cars would be employed in releasing and removing those cars between the place where said cars were stored and the switchstand, and that when any one or more of the string of six cars should be removed, if the brakes were not set or the wheels blocked on the remaining cars, they would be likely to roll out toward the main track, causing a collision. The evidence is uncontradicted that the stock car was the only one of the six cars that was either braked or blocked. This stock car was one of the three cars removed and taken to the switch, and when it was removed, the other three cars loaded with coal and weighing some 210 tons were left on the side track without anything to hold them in place. The deceased at the time of his death was at a place where he had a right to be and in the discharge of his ordinary duties as brakeman.

The plaintiff offered the following testimony as to the duty and custom of the defendant at Willow Springs as to securely fastening the cars set out on the side track at the time they were set out, for the purpose of showing that when any of them were subsequently cut loose the brakeman engaged in that service would not be required to see that the remaining cars had brakes set or were otherwise secured by blocking: (From testimony of C. O. Hegberg.) "Q. Now, Mr. Hegberg, examine this book which I hand you and state what it is or what it contains? A. That is a book of the rules of the Frisco Railroad Company. Q. State whether or not you have engaged (at Willow Springs) in the switching of cars and in the plac-

ing of cars from the side track to the main track in switching cars? A. Yes, sir; I have. Q. Describe the side track there and its grade? A. It is down grade there where you set out cars. Q. Down grade in what direction? A. Down grade to the south. Q. Go on? A. If I should go there I should see that the brakes were set on the cars as they were set out. Q. Are there any special instructions about that at that place? A. Yes, sir; there are; there are instructions to set brakes on all cars set out; that is a rule in the book of rules."

The rules referred to are as follows:

"438. Cars left at stations must have sufficient hand brakes set to prevent any possibility of their being blown out. The air-brakes must be released and not be depended upon to hold cars left at stations. All cars left at non-agent sidings must be coupled-up when practicable. In cases of single cars, or one with defective brakes, wheels should be securely blocked in addition to having hand-brakes set. Conductors setting out or picking up cars must see that cars which are at the farther end of side tracks clear and that brakes are still applied."

"504. Agents must not allow cars to stand on main or passing track for loading or any other purpose without special permission from the superintendent or train master in each case. He must know that cars on siding properly clear main track, that brakes are applied and wheels blocked when necessary, to prevent the possibility of their being moved by the wind, and that all standing cars are out of the way for passing trains at night. They must also see that doors of covered cars are closed."

The same witness, being recalled in rebuttal, testified in part as follows: "By the court: Q. Now when there are several cars on the side track, such as have been described in this case, and it is desired

to take out a part of them and leave a part of them in there, and a brakeman comes up and cuts some of them loose from the others, do you know whether it is proper and usual and customary for that brakeman to see whether the cars which are being left standing upon the side track have sufficient brakes set to hold them in there, and does he do that before the uucoupling is done? A. The man that sets the cars out there does that; he is supposed to set the brakes on those cars. Q. At what time does he do that? A. He is supposed to do that when he sets the cars out there. The man that set the cars out before that is supposed to set the brakes on the cars. Q. Suppose there are half a dozen cars set out on the side track, as in this case, and it is only necessary to have one or two brakes set at the south end, or sufficient brakes to hold them in, now if a brakeman comes there to get out two or three cars, should he see about the brakes on the cars which are left in there before he uncouples the cars to take them out? A. When they kick the cars back there then they should brake enough so they won't roll out. Q. If, as in this case, the track is sloping to the south, and the brakes are set on the cars which he is taking out, and he is leaving for the time being cars which are supposed to be left upon the side track and they are insecure, would it be customary in so doing that he should see that brakes are set on the cars which are left, before the other cars are uncoupled? A. He would naturally think the brakes were set upon those cars that are to be left. Q. On all of them? A. Yes, sir. If I go to Willow Springs and set out a car, I would set the brake on it. Q. Suppose you set out six or ten cars? A. I would set the brakes. Q. On all of them? A. Yes, sir; so that in case another man comes in and gets a car the cars left will not roll out. If the track is sloping to the south, it would be the practice to set the brakes on each car because if he should leave some without

brakes you could go and take out several cars at the south end and that might leave the north cars without being fastened at all.''

If the collision caused by the loose cars had resulted in the death of the fireman or engineer, the prima facie liability of defendant under the evidence would have been incontestable, and it would have been quite immaterial in such case which of defendant's brakeman was responsible for their escape. The fact that John Hegberg, a brakeman, was killed instead of the fireman in no way changes the legal status of the case, except decedent's failure in duty, if any, could be shown by defendant under its plea of contributory negligence.

We appropriate and apply to this case the language of our Supreme Court in the case of Jones v. Railroad, 178 Mo. 528, 545, 77 S. W. 890: ''It was the duty of the master in this case to use reasonable care to prevent those cars escaping, and, therefore, when they were found running loose, so as to imperil the life of the servant who was in the due performance of his duty, the presumption is that the master did not use reasonable care to hold his cars on the side track, and the burden is on him to prove that he performed his duty in this respect; it devolves on him to explain the occurrence.'' [See, also, Vanderbeck v. Railroad, 154 Mo. App. 321, 133 S. W. 1178; Continental Trust Co. v. Railroad, 87 Fed. 133.] The reasoning in the Jones case goes to the vital questions involved herein. But the position of the plaintiff in this record is more strongly fortified than that of the plaintiff in the Jones case because the further fact is conceded in this case that none of the brakes on the cars that escaped were securely set nor were the wheels blocked by defendant's employees as should have been done and as its rules required.

The appellant contends with great earnestness that the facts supporting its plea of contributory neg-

ligence are in such irreconcilable conflict with the verdict of the jury as to have required a directed verdict. It therefore becomes necessary to examine the facts pertinent to that issue.

The train crew at the time of the accident consisted of F. D. Thayer, conductor, N. N. Hudson, engineer, George Slater, fireman, T. L. Livingston, head-brakeman, and deceased, John Hegberg, rear brakeman. Upon the arrival of this freight train at Willow Springs, the train crew was ordered to make up a train at said place and run the same to Springfield. In addition to the main track at Willow Springs, there is a side track, west of the main track and south of the depot, and there were six cars, four loaded and two empty, standing on the side track at the time in question. The three rear cars that were loaded with coal weighed some 210 tons. Under the orders received by the train crew, they were required to take one of the six cars from the side track to the main track in order that the train might take the same to Springfield. In performing this work, this car being the fourth car from the north or rear end of the six cars, it was necessary to couple three of said cars to the engine and uncouple them from the other three cars which were to be left, and to convey the three cars attached to the engine to the switch south of the station house, and to kick the loaded car desired onto the main track, and then to take the remaining two cars not desired for the Springfield train back to the side track to their original position beside the three cars that had not been removed. Under the admissions it will be seen that the side track upon which the six cars were standing had a downward grade toward the south and toward the switchstand. The evidence tends to show that the six cars on the side track were a distance of twenty-five to thirty car length north of the switchstand. The first of the six cars—commencing to count from the upper or north

end of the string of cars—was loaded with coal, as were also the second, third and fourth cars; the fifth was an empty stock car, with a brake on the top on the south end, and this was the only brake of the six cars that was set and it held the string of cars in place; the sixth car, or the one that the engine coupled to, was empty. The second and third cars had good brakes in good condition but they were not set. The evidence tends to show that the customary method of operating freight trains when engaged in switching at stations is for the engineer and fireman to remain in their places on the engine; that the coupling and uncoupling of cars and the releasing and setting of brakes is generally done by the brakeman, and the operation of the train, in moving or stopping it, is by signals of the brakeman to the engineer in the day time, by movements of the hand, and at night, by the movements of a lantern.

George Slater, the fireman, testified as to what took place immediately before the accident, in substance, as follows: We had orders at Willow Springs to pick up the loaded coal car, the fourth car of the six from the north end. These six cars were from twenty to twenty-five car lengths north of the switchstand on the side track. The night was somewhat dark when the switching was done. When the engine headed in on the side track, the front part of the engine was toward the north with the tender in the rear. The engine was being moved north on the side track to be coupled to three of the cars. After we got in on the switch I saw Hegberg; he was standing on the box car, the fifth car from the rear or north end and the second car from the front or south end of the string of cars. At the time I saw him on top of this car he was letting off the brakes on top of the car. What made me think it was Hegberg was the movement of the lantern. When I saw the man I took to be Hegberg on top of the high car, he turned off the

brakes, then turned around, walked back to the rear end of the car and got off on the engineer's side and I did not see him anymore. At the time he got off, the three cars were moving out toward the switch. At the same time that he was on top of the car, I saw another lantern on the ground down the track a little nearer the switch than where the three cars were left. I did not know whether it was Livingston or not. The witness further testified on cross-examination that according to the customary mode it would be the duty of the brakeman who cut the three cars loose from the three cars that were left standing to "tie" the other cars, that is, secure them so they would not roll out; that it was his duty to get up there on the cars that were left standing and set the brakes, or block the cars, so they would not run out, and that he should perform this duty before he cuts the cars loose. · He also testified, by way of impeachment of witness Livingston, as to a conversation he had with Livingston, saying he was passing along where Livingston was standing, and said to Livingston, "Who uncoupled those cars at Willow?" and that Livingston just said, "Me." That that was the word he used. This witness also testified that when they were returning the two empty cars to their places on the side track, the three cars that had been left standing there had moved down, and collided with them about two or three car lengths from the switch, that is, a little north of the switchstand.

C. O. Hegberg testified also that he was an engineer in the employ of the defendant company and a brother of the deceased; that he was familiar with the duties of brakemen on the defendant's railroad and had himself been engaged in that employment some years. He testified as an expert, in part, as follows: "Q. Now, Mr. Hegberg, if there were just two brakemen as there was in this case, and the engine should go back up where the six cars were, the man that was

on the rear end, that you call the rear brakeman, would be the man that would get upon the car and turn or unloosen the brake on the car that is to be cut loose from the other three, that would be the man according to the usual and ordinary custom who would get down and cut the cars loose, the one that let the brakes off? He would be the man that would get down and signal the engineer and cut the cars from the other three that were to be left there? A. No, sir; not the man that let the brakes off; the other man would cut the cars off on account of keeping the other one from climbing down. Q. Now, assuming that the other man was down with the engine, or at the switch? A. The other man would be on top of the cars. Q. Now then, assuming that there are the three cars here and they are all attached and assuming that there were only two brakemen, now when the engineer backs up here somebody couples him up? A. Yes, sir. Q. This one on top of the car doesn't get down to do that? A. No. Q. Now then, assuming there is one brakeman here and the other is up here on top of the cars loosening the brakes, in such an event would not he naturally get down here and uncouple this car and give the signal, if the other man was coupling out here? A. Certainly, if the other man was out there. Q. Assuming that was the position now? A. Yes, sir. Q. Assuming that one of the brakemen was out there? A. Yes, sir. Q. Then in such an event the man up on top loosening the brakes would naturally get down and make the cut and give the signal to back out or pull out, as the case may be? A. Yes."

The latter part of the testimony of this witness is claimed to be in direct conflict with the other parts. But the latter part is rendered unintelligible because of the manner of examining the witness at the trial. The expressions employed—"here," "out here," "out there"—makes it impossible to determine what places are referred to. The witness was evidently examined

with a map or diagram of the scene of the accident before him, which is not made a part of the record presented to us. We cannot hold that the witness contradicted himself when the appellant who made up the record, if it desired to have such conflict appear, did not include the map or diagram, and its failure in this respect will not authorize us to draw unfavorable inferences against the respondent's evidence.

F. D. Thayer, the conductor of the train crew that night at Willow Springs, was at another part of the switchyard at the time the accident occurred and was unable to testify as to the facts and circumstances surrounding the switching and the killing of the deceased. He was there, however, a few minutes after the accident, and he states that he found Hegberg lying on the pilot of the engine. "He was lying clear back over, bending over the pilot of the engine, in the pilot-beam and across the pilot-beam, inside of the flagstaff, between that and the boiler and the front end; he was close to the coupler—something like about three feet, or two and one-half feet, or something like that from the coupler to where he was lying. He was lying upon his back. He had been thrown back. Was mashed up apparently about the lower bowels. It looked as though he had been struck by the car and pushed over on the pilot-beam. We found him on his back and he looked as though the car had pushed him over and mashed him."

T. L. Livingston testified on the part of the defendant that he was a member of the train crew at Willow Springs on the 12th day of July, 1910, when the accident occurred; that it took place between 9:20 and 9:25 at night. He stated that when the engine was headed in on the side track, going north to where the six cars were stationed, he unlocked the switch in order to let the engine in on the side track, and that at that time he saw the deceased on top of the high car, being the second car, counting from the switch.

He could not tell what Hegberg was doing but saw his lantern up there. "We went down there (to the six cars) and when we got down there he was standing upon the high car. He got down and then stood on the ground, standing by the side of the car, after he had gotten off. Then I went ahead and coupled the engine to the first car of the three. Hegberg was still standing on the ground at the other end of the three cars to be cut off and gave the back-up signal and we backed towards the switch. He had already gotten off the high car and was standing on the ground before he gave the back-up signal. At the time, the cars were not moving—just standing there. The cars then moved down toward the switch. I continued to stand in the same place until the stock car came along and I caught on the side of it. Hegberg rode back to the switch on the rear end of the loaded coal car."

N. N. Hudson, the engineer of the crew, testified: "When we headed the engine in on track No. 1 to where the six cars were standing, Hegberg was then on one of the three cars. Livingston was behind the engine. When we got to the three cars, Livingston stepped off, opened the knuckle, and gave the signal to 'slack ahead' or 'couple up.' We took out three cars and left three standing. Hegberg was the brakeman who uncoupled the three cars from the other three. When we made the coupling to the engine, Hegberg gave me the signal to back south and I immediately did so." On cross-examination, the witness made the following statement: "Q. The first you saw was when you got up there, you saw somebody and you went by the signal, didn't you? A. Yes, sir. Q. You could not see his face? A. No, sir; I could not say that I did. Q. So you couldn't say of your own knowledge that it was Hegberg that uncoupled the cars? A. No, sir; I could not see his face to recognize its being Hegberg; by the way they were doing

the switching, the two brakemen, I naturally presumed it was Hegberg.''

C. O. Hegberg, in rebuttal, by way of impeachment of Hudson, testified as follows: ''Well, Mr. Hudson said the two brakemen got on the engine and they backed down the main line and one of them dropped off at the derailer and the other one went down and dropped off at the switch and threw the switch and they headed in to pick up the car. I asked him how he knew John (the deceased) and he said they had an extraordinary good headlight and he could tell it was John. He said that he got up on the high car and the other brakeman went back about to the place and he supposed to cut the cars off.''

The plaintiff's prima facie case as to the duty of the defendant to set the brakes or otherwise secure them when the six cars were first set out on the side track at Willow Springs rests upon the evidence of C. O. Hegberg, who so testified, and who also testified that when the three cars were cut loose from the six, it was not the duty of the brakeman to see that the brakes on the remaining three were secure, but that such brakeman had a right to assume that all the cars had brakes set when they were first left on the side track.

From an examination of the evidence it will be seen that the principal witness for the defendant as to which brakeman cut loose the three cars from the remaining three was the brakeman Livingston, and that the principal witness for the plaintiff as to which brakeman cut loose the cars was George Slater; and when their testimony is carefully examined as to the controlling facts it is found to be in irreconcilable conflict, so that it is physically impossible that both should have given the true version of the facts and circumstances as to the uncoupling of the cars. If Slater is to be believed, Livingston was the brakeman who uncoupled the three cars from the three left stand-

ing. If Livingston is to be believed, Hegberg was the brakeman who uncoupled those cars. Slater's testimony tended to show that Hegberg was on top of the high car and released its brakes and continued on top of the car until the cars were uncoupled and had commenced to move south toward the switch and that he then got off; that the witness (Slater) saw a lantern of another brakeman near the place where the cars were uncoupled at the time he saw Hegberg on top of the high car. Livingston testified, on the other hand, that prior to the time he coupled the engine to the first car, deceased had gotten off the high car and was standing on the ground near the opening between the third and fourth cars and that the cars were then standing still; that Hegberg then uncoupled the cars and gave the signal to the engineer to back up. We are of the opinion that the testimony of Slater, together with that of C. O. Hegberg, as to the manner in which the brakemen usually discharged their several duties, furnished facts and circumstances from which the jury might reasonably infer that Livingston and not the deceased cut loose the three cars.

The rules of law governing appellate courts in determining the sufficiency of evidence to withstand a demurrer thereto have been often declared. In considering a demurrer to evidence, care must always be taken not to infringe upon the constitutional right of trial by jury; and, when the undisputed evidence in the record is susceptible of two inferences, one consistent with ordinary care, and the other tending to show negligence, such evidence, leaving a ground for difference between fair-minded men as to whether or not negligence existed (that is, if the evidence is susceptible of two inferences, one consistent with ordinary care, and the other tending to show negligence) the question is one of fact for the jury. This is the more apparent when it is considered that negligence is not a fact susceptible of direct proof but is an

inference deducible from the evidence, and its exist-
ence may be in issue though the facts on which it is
based are not in dispute.  It is also elementary law
in this state that a demurrer admits every fact of
the plaintiff's case to be true which the evidence tends
to prove, whether the evidence be direct or indirect,
as well as all reasonable deductions that are to be
drawn therefrom, and defendant's evidence contra-
dicting plaintiff's fills no office; and, before a court
can take a case from the jury and consider the ques-
tion of negligence as a matter of law, the facts must
not only be undisputed, and the credibility of wit-
nesses not drawn in dispute, but no material fact must
be left in doubt, and the facts, when most favorably
considered for the plaintiff, must be fairly susceptible
of but one inference.  [Morgan, Adm'r, v. Oronogo
Circle Mining Co., 160 Mo. App. 99, 141 S. W. 375;
Evans v. Railroad, 178 Mo. 508, 77 S. W. 515; Eckhard
v. St. Louis T. Co., 190 Mo. 593, 89 S. W. 602; Wil-
liamson v. St. Louis T. Co., 202 Mo. 345, 100 S. W.
1072; McKenzie v. United Rys. Co., 216 Mo. 1, 115 S.
W. 13.]  Applying these rules to this case, we cannot
say that the trial court committed error in overrul-
ing the defendant's demurrer to the evidence.
Whether the evidence is examined to determine the
decedent's contributory negligence or to ascertain the
extent it overcome the plaintiff's prima facie case,
the plaintiff's inviolable right to a trial by jury would
have to be respected by the court.  Where the petition
is denied and plaintiff has the burden of proof, and
has made out a prima facie case by oral evidence, the
court has no authority to sustain a demurrer to the
evidence, but plaintiff has the right to go to the jury
on the question of the credibility of the witnesses;
and though plaintiff's witnesses are uncontradicted,
and defendant offers no evidence at all, the court has
no right to direct a verdict, but defendant is entitled
to have the jury pass on the credibility of the wit-

nesses. Link v. Jackson, p. 195, supra, 139 S. W. 588. The court committed no error in its refusal to peremptorily declare as a matter of law that deceased was guilty of contributory negligence by reason of his failure to secure the loose cars.

The appellant further contends that the deceased was guilty of contributory negligence in that he voluntarily selected a dangerous method of uncoupling the cars and could have avoided the accident by a safer course; that the appellant had provided the most approved appliances for the safety of the deceased and that it was his duty to use them.

The evidence on the part of the defendant tends to show that. the engine had an automatic coupler at the time of the accident; that by the use of this coupler, the brakeman could reach in and catch hold of the rod, lift the rod, raise the knuckle-pin out, and let the knuckle open, without going between the engine and the car. The engineer testified that the deceased gave him the signal to stop and that the deceased was on the ground at the time. "He gave me the signal to stop and then jumped upon the pilot of the engine. I stopped the engine after going some twelve or fifteen feet. Then the collision of the three cars followed. He jumped upon the pilot before I could see anything of him. I never knew of him doing that before in attempting to make the coupling or uncoupling of the cars." The printed rules of the defendant company forbade brakemen to jump upon the pilot in coupling or uncoupling cars; and under the regulations of the company it was not permissible under any circumstances for employees of the company to ride upon the pilot while the engine was moving. The regulations had been in force two or three years before the accident took place and the deceased at that time had been four years in the employ of the defendant company and he was well acquainted with these facts. The evidence further tended to show that the

automatic coupler had a handle on both sides of the engine and that it could be lifted without the brakeman going in between the engine and the car. The ground was level where the accident took place, filled up to the tops of the ties, and there was nothing to prevent the deceased from taking hold of the automatic coupler and making the uncoupling while he was standing on the ground. Defendant introduced a number of its employees to prove these facts. The plaintiff in rebuttal introduced evidence tending to show that it was customary on the defendant's railroad for employees to go between the engine and the car while the same was in motion and ride upon the step or pilot of the engine to uncouple the cars while they were in motion and that such fact was known to the superior officers and acquiesced in as a common custom and practice. Also, there were facts and circumstances tending to show that the handle of the pinlifter of the engine was in such a position that in order to perform the duty of uncoupling the car it was necessary for the deceased to step upon the pilot or go between the engine and the car. The court on this subject gave the following instructions:

"(4) If you should find from the evidence that defendant had established a rule prohibiting its employees from being upon the pilot of the engine while the same was in motion still if you find that deceased, John Hegberg, just prior to the time of his death was attempting to uncouple the two cars from the engine and if you find that the handle of the pinlifter of the engine was in such a position that in order for him to perform his duty and uncouple said cars it was necessary for him to step upon the pilot or go between the engine and cars and if you find that an ordinarily prudent person under similar circumstances and conditions would have stepped upon the pilot or would have gone between the cars for the purpose of uncoupling and that it was the uniform

custom within the knowledge and acquiescence of the superior officer of the defendant for brakemmen to step upon the pilot or go between the cars while the same were in motion in coupling or uncoupling, then the violation of said rule by deceased, if you find it was violated, would not of itself defeat a recovery in this case.

"(5) Even though you may believe that defendant company had a rule requiring brakemen to couple and uncouple cars from the ground and you further believe that John Hegberg, deceased, was not at the time he was killed complying with that rule but was doing the work in a manner in which the same was customarily done by the employees and servants of defendant company with the knowledge and acquiescence of the superior officers of defendant company then such violation of the rule, if there was any, would not preclude a recovery in this case on account of the violation of said rule.

"(6) The jury are instructed in this case, the defendant pleads contributory negligence by John Hegberg, deceased; upon that issue the burden of proof is on the defendant, and it devolves upon the defendant to prove such contributory negligence by a preponderance of the evidence to the satisfaction of the jury, before you are warranted in finding for defendant on that issue, unless the evidence offered by plaintiff shows that he was guilty of contributory negligence. And in this connection you are further instructed that the law presumes that the said John Hegberg was in the exercise of ordinary care in the absence of evidence to the contrary.

"(7) If you believe and find from the evidence that John Hegberg got between the engine and the car to be uncoupled while the same was in motion, or was riding upon the step or pilot of the engine for the purpose of uncoupling the car, and further find that said Hegberg could, by the exercise of reasonable

strength and skill, and while upon the ground, have uncoupled the car from the engine by using the automatic coupler, and that if he so used the automatic coupler he would have avoided the injury, then you should find the issues for the defendant; unless you further find from the evidence that said Hegberg in getting between the engine and car to be uncoupled while the same were in motion or in riding upon the step or pilot of the engine to uncouple the car, if he did get upon or between the same while they were in motion, was performing said work in the usual and customary manner and that his superior officers knew of and acquiesced in such custom and practice.

"(9)  The court instructs the jury that if you find and believe from the evidence that John Hegberg was not using ordinary care and exercising ordinary prudence at the time and place of his injury, and that the failure to use such care and prudence, directly contributed to cause his injury resulting in his death, then you will find for defendant, and you are instructed that ordinary care is such care as would be used by an ordinarily prudent person under the same or similar circumstances.

"(10)  The court instructs the jury that the charge of negligence made by the plaintiff against the defendant in this action must be proved to the satisfaction of the jury by the preponderance of the evidence.  The jury have no right to presume negligence and if the evidence does not preponderate in favor of plaintiff, then your verdict should be for the defendant."

We think these instructions as to contributory negligence were a correct embodiment of the law. The evidence was conflicting as to the common practice of getting upon the pilot and using the automatic coupler while the cars were in motion; and although the company had posted rules forbidding uncoupling by getting on the pilot or between the cars while the

uncoupling took place, if the company's officers knew of the violation of the rule and with their tacit consent had allowed the same to be habitually violated, the deceased in pursuing the usual method of uncoupling cars was not guilty of contributory negligence. [Brady v. Railroad, 206 Mo. 509, 102 S. W. 978, 105 S. W. 1195; Francis v. Railroad, 127 Mo. 658, 28 S. W. 842, 30 S. W. 129; Barry v. Railroad, 98 Mo. 62, 11 S. W. 308. At any rate, the burden of proof as to this issue was upon the defendant and it was for the defendant to show by a preponderance of the evidence the contributory negligence of the deceased, and the question was properly one for the jury.

Another question raised for the consideration of this court is the competency of certain testimony offered in chief by the plaintiff in his behalf. The father of the deceased was called as a witness and was allowed to testify as to the earnings of the deceased and the amount of money he had furnished and would furnish his father and mother during his lifetime and their dependence upon his earnings for their support. The record is as follows: "Q. How old was John Hegberg at the time he died? A. He would be twenty-eight on his next birthday. Q. Do you know how much he earned before his death? A. He earned from eighty to a little over one hundred dollars a month. Q. Now, state whether or not he was the only single member of your family? A. Yes, sir; he was. Q. He was not a married man? A. No, sir. Q. He was a single man? A. Yes, sir; a single man. Q. Now, Mr. Hegberg, state whether or not you and your wife were dependent, prior to his death; were you dependent upon anybody for support, if so upon whom? A. Yes, sir; we were. Q. Were you dependent upon anybody for support? A. Yes, sir. Q. Upon whom? A. Upon John Hegberg; he helped us whenever we needed it. Q. How long

had he been helping you? A. For the last five or six years. Q. For five or six years before his death? A. Yes, sir. Q. How much money did he contribute to your support? A. Sometimes he would give us a whole lot. Q. About what amount would he give you? A. Up as high as fifty dollars some months; some months twenty-five dollars and some months ten dollars. Q. Different sums that way? A. Yes, sir. Q. About what would it average per month? A. Taking it all together it would be thirty or forty dollars a month anyhow, on the average. Q. What is your age? A. I am seventy-two. Q. What is the age of your wife? A. About sixty-eight."

The plaintiff in introducing this evidence asked the witness whether or not he and his wife were dependent upon any one prior to the decedent's death and if so upon whom. This was objected to by the defendant as leading and for the reason that it was a suit by the administrator for the benefit of the estate. The witness was also asked to state his age and the age of his wife. The defendant objected for the reason that it was irrelevant and immaterial. The testimony was admitted over defendant's objections and exceptions. The objection to the question as to whether the witness and his wife were dependent upon the decedent was for the assigned reason that the suit was for the benefit of the estate.

The respondent insists with great earnestness that the objections made to this testimony are insufficient to bring the questions involved before this court for its consideration, basing such continuation upon the fact that objections were only made to portions of the evidence, as to whether the witness and his wife were dependent, and as to their ages. An examination of the record shows that the parts objected to belonged to the same class as the evidence admitted. The scope of the objection was that evidence as to the dependence of the father and mother upon their deceased son

was incompetent because the suit was by the administrator of the estate and it was not proper evidence to establish the measure of damages. Under the issues in this case we hold that defendant's objections were sufficiently well-timed and numerous enough to meet all the requirements of the law and that defendant was not required to keep up a running-fire of objections throughout the entire examination. [Bailey v. Kansas City, 189 Mo. l. c. 513, 87 S. W. 1182.]

The consideration of the competency of this evidence leads to an investigation of matters of original and vital importance. Prior to the revision of the statutes in 1909, the sections of the damage act material in this connection were sections 2864 and 2865. No action under them was given to an administrator, either for the benefit of the estate or collateral kin. Prior to the amendment of 1905, section 5425 (then section 2864) fixed the damages at five thousand dollars and did not contain the fourth clause authorizing a suit by the executor or administrator of the deceased. And prior to the amendment of 1907 of section 5427 (then section 2865) an executor or administrator could not maintain an action for the negligent killing of his testator or intestate—that is, the fourth clause appearing in section 5425 had not been incorporated by amendment into the latter sections.

This action must be maintained, if appellant's contention is true, under the provisions of section 5425. The Supreme Court has twice construed this section. In the case of Young v. Railroad, 227 Mo. 307, 127 S. W. 19, Division Number One of the Supreme Court, in an opinion written by Judge VALLIANT, expressly held that damages recovered under this section of the damage act are not given as compensation to the aggrieved but as a penalty which the law prescribes for the killing of a human being. Referring to the succeeding sections (5426 and 5427) the opinion states (l. c. 332): "If it be a case in which

the damages as for compensation to the person injured
be in question, the jury after assessing compensatory
damages may, in a proper case, look into the charac-
ter of defendant's conduct to see if punitive damages
should also be awarded. In the case at bar, however,
the damages are not given as compensation to the
party aggrieved, but as a penalty which the law pre-
scribes for the negligent killing of a human being; it
is all penal in its character and in fixing the penalty
the jury have a. right to consider the conduct of the
negligent part beyond the mere finding that he was
negligent; they may consider whether the conduct
which resulted in the catastrophe arose from mere
inattention, or was willful, wanton or reckless. That
is what the jury does in assessing the punishment for
a crime. and it is what the amendment of 1905 to sec-
tion 2864 authorizes the jury to do in assessing the
amount of the penalty under that section of the stat-
ute.'' The Young case was decided March 1, 1910,
and the opinion was concurred in by all the members
of that division of the court. The courts of appeals
construed this opinion as establishing the law that
section 5425 provided for penal damages only. In
the later case of Boyd v. Railroad, 236 Mo. 54, 139
S. W. 561, the question again came before the Su-
preme Court. The Boyd case was an action for dam-
ages by the widow under section 5425 for the wrong-
ful death of her husband. At the trial the plaintiff
offered to prove the number of her minor children and
their ages. The Supreme Court, after an examination
of the prior decisions as to the nature of damages to
be awarded in such cases, under statutes in this and
other countries, reached the conclusion that it was
certainly intended in prosecutions for liability under
this section that the jury should distinguish between
a man of little or no earning capacity and one whose
strong arm is equal to the demands upon it. The con-
clusions of the Boyd case were reached by applying

a different rule of construction than that which had been oftentimes invoked in prior constructions of these sections of the law. Instead of applying the rigid rule that statutes in derogation of the common law are to be strictly construed, the rule was applied that the statute, being highly remedial, should be liberally construed to effect its purpose; that on the remedial side, the jury might consider the extent of the pecuniary injury; and, as it had a penal side, the jury had a right to consider the facts of negligence in determining the defendant's culpability and the amount of damages to be allowed under that phase of the case.

In this case, the parties litigant antagonize each other as to which section of the damage act the suit is prosecuted under. As we have stated, the appellant contends it is under section 5425 and the respondent that it is under sections 5426 and 5427.

The causes of action given by the penal and compensatory sections of the damage act in case of a wrongful death resulting from negligence are diametrically opposite; the affirmative of the constituent facts of a cause of action under one section is a denial of them under the other. For a death resulting from the negligence of the peculiar character specified in section 5425, the aggrieved plaintiffs cannot elect to sue under that section *or* under sections 5426 and 5427. The right of action given by section 5425 is for a death caused by the negligence of a servant operating the defendant's instrumentality of transportation, while the right of action given in sections 5426 and 5427 is for a death caused by the negligence of the defendant through his servant in some other particulars, or by other parties, than those described in section 5425. These are purely statutory rights and must rest each upon its own statute. [Casey v. St. Louis T. Co., 205 Mo. 721, 724, 103 S. W. 1146; Casey v. St. Louis T. Co., 116 Mo. App. 235, 91 S. W. 419.] If the servants and agents of the defendant railroad

company killed the deceased under circumstances such as to create a liability under section 5425, Revised Statutes 1909, necessarily defendant is not liable for such killing under any other section. Contra, if the servants and agents of the defendant killed the deceased under circumstances making defendant liable under any other section of the statute than 5425, such defendant was necessarily not liable under such section.

It is held by the Supreme Court that it is not necessary for the pleader to designate under which of these sections his action is brought; nor would such description if once made be conclusive as to which section the liability was based upon.

The understanding of respondent in this action is that his petition was drawn under the so-called compensatory section. His evidence was given, the instructions were drawn, and the trial was conducted, all on that theory. In support of this position the respondent states in his brief that the allegations in his petition "when considered together based the cause of action upon the failure of the master to furnish the servant a reasonably safe place in which to work and that the injury did not occur through the neglect of the employee whilst running a car or train of cars. It is true that the master is required to furnish his servant a reasonably safe place in which to work and a failure to discharge that duty with resulting injury is actionable negligence. But where the place in which the servant is at work is rendered insecure and his injury and death results through the negligence of the servants of a railroad company whilst running, conducting or managing any locomotive, car, or train of cars, then a cause of action arises under section 5425. It is urged however by the respondent that under the evidence he could not recover under section 5425 because deceased was not engaged at work on a car and injured whilst it was being run, and that

the injury did not occur on account of the negligence of any servant whilst running the car where he was at work; that the injury was caused by the escape of the three cars which were not then being operated by any employee but which were stationed on the side track, and that for this reason the cause of action was based on the so-called compensatory sections (5426 and 5427). This is a misapprehension of the meaning of section 5425. The general purpose of the statute was to allow damages for the negligent acts of servants or employees (resulting in death) engaged in running, conducting or managing public conveyances controlled mostly by common carriers. It requires that the negligence of the defendant's employees must have concurred in point of time with the movement or operation of its cars, but not that the negligence must have concurred in point of time with the infliction of the injuries that cause the death. If any employee of defendant whilst running or managing its cars was guilty of negligence, and such negligence caused injuries to plaintiff's intestate which resulted in his death, then the defendant incurred the liability created by such section of the statute. And although the injuries resulting in the homicide are usually inflicted while the cars are being operated, and not subsequently, this need not necessarily be so. This is an interpretation of the statute that comports with the maxim, "Statutes made for the public good ought to be liberally construed."

The case of Buddenberg v. Transportation Co., 108 Mo. 394, 18 S. W. 970, was an action for wrongful death by reason of the defendant steamboat company having improperly landed the deceased at an improper place so that he fell into the river. The landing was at what was called the Diamond Joe wharfboat, which was a long, covered structure, boarded down to within seven feet of the floor. There were two openings on the river side, the small one being constructed so

as to be closed with guardrails on either side to protect persons and property, but which, on this particular occasion, were down. After the deceased had been safely landed, he was on the wharfboat giving directions as to loading his wagon with his goods, and while moving about near the opening fell overboard and was drowned. It was held by the Supreme Court that the action was based on section 2121, Revised Statutes 1879 (now section 5425) and that the liability was incurred by the negligence of the defendant whilst its servants were running, conducting and managing a steamboat. In this case the injury to deceased did not take place at the time of the negligent landing, but afterward.

Under the general rule of actionable negligence, the results of the negligence of the defendant's employees may have been long delayed, or the negligent act may have caused decedent's death in the twinkling of an eye, as the flash of lightning follows the thunderbolt. Neither the length of the chain of causation, nor the number of its links, nor the length of the period of time which elapses between the causal negligence and the resultant injury in any way affects the statutory liability. But while the injury need not immediately follow the negligent act, it must appear that the injury was the natural and proximate consequence of the negligence, and might and ought to have been foreseen by a reasonably prudent man in the light of all the attendant circumstances. [Paden v. Van Blarcom, 181 Mo. 1. c. 127, 74 S. W. 124, 79 S. W. 1195; Poeppers v. Railroad, 67 Mo. 715.] The defendant's liability to the plaintiff in this case, if any, arose from the negligent act of the defendant's servants when they set the six cars out on the side track at Willow Springs and failed to securely fasten them by brakes or by blocking the wheels, or by reason of the defendant's brakeman (on the day of the injury, while in charge of and managing or controlling

the defendant's cars) negligently failing to secure the three cars which were left.

The plaintiff's petition does not in express or formal terms allege that defendant's servants so negligently managed and controlled its locomotive and cars as to cause the death of plaintiff's intestate, but from its statements, such facts are necessarily implied, and this is a sufficient averment of them. [Werth v. City of Springfield, 78 Mo. 107; Dillon v. Hunt, 82 Mo. 150.] As our statutory code of procedure prescribes no set formulae for stating a cause of action arising under the damage act, we are of the opinion that the petition in the case at bar, though informal, states the necessary, constituent facts in such a way as to apprise the defendant that plaintiff's cause of action was for a liability under section 5425, though plaintiff himself had a different view. [Little v. Mercer, 9 Mo. 218; Rodgers v. Fire Ins. Co., 186 Mo. 248, 85 S. W. 369; State ex rel. Iba v. Mosman, 231 Mo. 474, 490, 133 S. W. 38.]

The appellant further contends that under the allegations of the petition the action is one by the administrator to recover assets for the estate, and that in such an action the evidence given by decedent's father, which we have set forth, was incompetent.

As is well known, at common law no action could be maintained for damages for loss of life. The right of action, therefore, set up in plaintiff's petition is the mere creature of statutory indulgence. [Gilkeson v. Railroad, 222 Mo. 173, 121 S. W. 138.] Hence the statute must be looked into. Section 5425 after authorizing recovery of damages for wrongful death, under circumstances named, then proceeds to designate who may sue for and recover the same, in the following order: "First, the husband or wife of the deceased; or, second, if there be no husband or wife, or. he or she fails to sue within six months after such death, then by the minor child or children of the de-

ceased, whether such minor child or children of the deceased be the natural born or adopted child or children of the deceased; . . . or, third, if such deceased be a minor and unmarried, whether such deceased unmarried minor be a natural born or adopted child, if such deceased unmarried minor shall have been duly adopted according to the laws of adoption of the state where the person executing the deed of adoption resided at the time of such adoption, then by the father and mother, who may join in the suit, and each shall have an equal interest in the judgment; or if either of them be dead, then by the survivor; or, *fourth*, if there be no husband, wife, minor child or minor children, natural born or adopted as hereinbefore indicated, or if the deceased be an unmarried minor and there be no father or mother, then in such case suit may be instituted and recovery had by the administrator or executor of the deceased and the amount recovered shall be distributed according to the laws of descent.'' From the allegations of plaintiff's petition it is apparent that the action is brought to enforce a liability under the fourth clause of section 5425. The specific question presented is whether under a proper interpretation of this fourth clause of section 5425 the administrator sues for the benefit of the estate, or whether he sues as the personal representative of the distributees who would be entitled to the decedent's real and personal property under the laws of descent and distribution. Section 332, Revised Statutes 1909, of our statutory law of descents provides that when any person having title to any real estate of inheritance or personal estate undisposed of, or otherwise limited by marriage settlement, shall die intestate as to such estate, it shall descend and be distributed in parcenary, to his kindred, male and female, subject to the payment of his debts and the widow's dower, in the following course: ''. . . second, if there be no children, or their descendants, then to his

father, mother, brothers and sisters, and their descendants, in equal parts.'' The deceased in this case was shown to have been over twenty-one years of age and to have been single and unmarried, so that the descent and distribution of his personal or real estate would be governed by the second subdivision of section 332, above quoted.

The true intention of the Legislature, as expressed in a statute, is to be ascertained by applying the well-known rule of construction that statutes are presumed to be enacted by the Legislature with full knowledge of the existing condition of the law and with reference to it, and are to be construed· as a part of a general and uniform system of jurisprudence, and that their meaning and effect is to be determined in connection not only with the common law but also in connection with other statutes on the same subject. In the application of this rule, it becomes illuminating to trace the history of the legislation giving the right to damages to dependents and kindred for wrongful death and the rules generally adopted to enforce such right.

Lord Campbell's Act is the prototype of most of the modern legislative acts by the states which provide for the recovery of damages for wrongful death, and many of its features have been faithfully preserved in the later legislation. In this act, the executor or administrator sues for the benefit of the wife, husband, child or children, or parents, and not for the benefit of the estate of the deceased. And while it is true that there are very few of the statutes that are exactly alike, and none precisely like ours, yet most of them, modelled after Lord Campbell's Act, create a liability in favor of certain beneficiaries surviving the deceased; and such right of action is held to be an entirely new cause of action, distinct and independent of any right of action the deceased had during his lifetime or would have had if he had survived the in-

jury. In actions under this class of statutes the inquiry is as to the extent of the damage sustained by the beneficiaries in consequence of the wrongful death. [8 Am. and Eng. Ency. Law, 859.] A comparison of Lord Campbell's Act with sections 5426 and 5427 of our statutes will show how closely in matters substantial the statutes of Missouri have followed the English statute in allowing the suit to be brought for distributees and not by the administrator for the estate, with the distinction that the distributees, except those named in the fourth clause, sue in their own behalf.

The Florida statute has been cited as authority for the plaintiff's contention that under the fourth clause of our section 5425 the administrator has the right to sue for the benefit of the estate. The Florida statute provides that in case of a wrongful death, under circumstances which, if death had not resulted, would have entitled the person injured to maintain an action, then the parties who would have been liable for damages if death had not ensued will still be liable to an action for damages. It then provides who shall bring the action giving the right, first, to the husband or wife, if surviving, and if there is no husband or wife, to the minor child or children; and if there are none of these surviving, then the action is to be prosecuted by any person or persons dependent upon the person killed for support; and where there are none of these classes, then the action is to be maintained by the executor or administrator, as the case may be, of the person so killed. It will be noticed that the Florida statute omits entirely the distinguishing feature of clause four of the Missouri statute, namely, *"the amount so recovered shall be distributed according to the laws of descent."* Under the Florida statute it was held by the Supreme Court of that state that it provided for an action by the administrator for the benefit of the estate. If the statute of Missouri had

not contained the concluding clause that the amount
recovered should be distributed according to the laws
of descent, the two statutes would have been almost
identical, and it might have been interpreted to mean
the same as the Florida statute. But such clause in
our statute cannot be regarded as surplusage. If the
Legislature had intended that the administrator of the
estate should be entitled to sue for the benefit of the
estate, the last clause should have been omitted, but
such an interpretation cannot be given without regard-
ing those words as surplusage. A familiar canon of
statutory construction is that every word of a stat-
ute, where it can be consistently done, is to be given
force and effect, especially if they are in harmony with
the legislative intent as collected from the entire act,
and that words of a statute will not be construed as
unmeaning and as surplusage if a construction can be
legitimately found which will enforce and preserve all
its words. No matter which of these sections the suit
is brought under, the damages must be sued for and
recovered by the same parties in the same manner.
Section 5427 provides that "in every such action the
jury may give such damages, not exceeding ten thou-
sand dollars, as they may deem fair and just, with
reference to the necessary injury resulting from such
death, to the surviving parties who may be entitled to
sue," which shows that the cardinal idea retained is
that the surviving parties are to recover for the neces-
sary injury resulting to them from such death, and
excludes the idea that such administrator is entitled
to bring the action for the benefit of the estate; no-
where is there an intimation that the damages are to
be assessed for the benefit of the estate. To inter-
pret the fourth clause of section 5425 as giving the
administrator the right to bring the action for the
benefit of the estate would be a sharp divergence from
the real purpose of the statute as manifested in other
portions of the act. The plaintiff alleges that he was

duly appointed and sues as administrator of the estate of John Hegberg, deceased, "and that plaintiff by reason of the death of the said John Hegberg, aforesaid, through the negligence and carelessness of the defendant as aforesaid, has been damaged in the sum of ten thousand dollars for which amount he prays judgment." This language can fairly be construed to mean that by reason of the death of John Hegberg his estate is entitled to that sum as damages to be recovered by his administrator for the benefit of the estate. No such action exists under either section of the statutes. We therefore conclude that the right of plaintiff to sue in this case, if such right exists, is as the trustee of an express trust and not for the benefit of the estate; and the beneficiaries provided for are the persons named in subdivision two of section 332 of the laws of descent and distribution.

The decision in the Boyd case, supra, declared evidence under the so-called penal section competent to show the amount of compensatory damages the widow had sustained by reason of the wrongful death of her husband. We see no valid reason why the same rule would not apply to beneficiaries under the fourth clause of the section as well as to those under the preceding clauses.

In estimating the amount of compensatory damages, if any are allowed, under section 5425, it would seem proper to apply the rule given by section 5427. It will not be assumed that the Legislature intended to make a different rule in case of a death occasioned by the negligent act of a transportation company or agents of a transportation company from that applied in case of a death occasioned by the negligent act of another corporation or person. And no good reason appears why there should not be one rule as to compensatory damages under whichever section they are recovered. It is apparent that no fixed rule can be established which can be adapted to all cases, but sec-

tion 5427 comes as near serving the purpose as any that has been devised; that is, that such an amount shall be allowed as the jury "may deem fair and just, with reference to the necessary injury resulting from such death, to the surviving parties who may be entitled to sue." By this rule the necessary pecuniary losses sustained by different persons who are next of kin are exceedingly variable. The loss by parents of a child of tender years, a husband losing his wife, or a wife losing her husband, all present cases of different pecuniary loss and involving different elements of damages. [Fordyce v. McCants (Ark.), 14 Am. St. Rep. 69, 71.]

In this case the compensatory damages are sought to be fixed by evidence showing the pecuniary assistance the deceased gave his father and mother during his lifetime by contributing money for their support out of his wages, and that they had a reasonable expectation of pecuniary benefit from the continued life of their son. The beneficiaries provided for by the fourth clause of section 5425, not being the immediate members of the decedent's family, are not in fact or in law by reason of the kinship, generally dependent upon the deceased, as the husband, or wife, or minor children usually are; and it would only be in cases where they have in fact been receiving pecuniary assistance, and then only to the extent of a fair and just estimate of their loss, that they could recover compensatory damages under section 5425. [Chicago & E. I. R. Co. v. Vester, 93 N. E. 1040; Fordyce v. McCants, supra, l. c. 70, 71.]

In this case the father and mother of the deceased were the only persons shown to have received support from the deceased during his lifetime; although having no legal claims on him, they were receiving pecuniary assistance from him and were dependent upon him to a certain extent, and were therefore entitled to recover compensation for the losses

they had sustained.   [Chicago & E. R. Co. v. Branyan, 37 N. E. 190.]    When the executor or administrator is entitled to recover for the beneficiaries designated by the statute, the jury are at liberty to take into consideration the  reasonable expectation of  pecuniary benefits, and the damages would be given only in respect to that expectation being disappointed, judged by the past, and for that purpose, they might take into consideration the ages of the deceased and the beneficiaries.    [Chicago & E. I. R. Co. v. Vester, supra; Fordyce v. McCants, supra, l. c. 72.]    The rule in such case is a hard one to apply as the damages are necessarily incapable of precise mathematical calculation and from their very nature are somewhat conjectural and problematical, dependent on the necessary pecuniary injury suffered, estimated from the facts proved, in connection with the knowledge and experience which the jury is supposed to possess in common with the generality of mankind.

Further objection is made to the testimony offered by the plaintiff for the reason that the collateral kin as a class have not suffered any damage, and that to allow damages for the pecuniary loss of the father and mother to the class, is to give the entire class the benefit of the loss of only two of the beneficiaries. Our so-called compensatory statute is very nearly a copy of the Wisconsin statute.  An action was brought in that state under such statute by the administrator for the wrongful death of a widow and the question now before us was under consideration.   The complaint showed that the deceased left surviving her eight children ranging in age from twenty-five years down to seven, and that three of the younger children were aged thirteen, eleven, and seven years.  Two of the younger children, it seems, were in poor health, and on that account, by the death of their mother, their pecuniary loss was greater than that of the other children, and this was made an objection to evidence

Hegberg, Admr., v. Railroad.

offered to show the amount actually expended for their support. The court in passing on the question said: "We think the facts stated show that the three children named in the complaint as being of the ages of thirteen, eleven, and seven years, suffered a pecuniary loss by the death of their mother." And it was also competent on the question of damages, under the court's ruling; because incidentally under the statute the other collateral kin might be benefited by this evidence furnished no good reason for excluding it. [McKeigue v. City of Janesville (Wis.), 31 N. W. 298, 301.] While it might seem more consonant with justice to compensate those only who had sustained the loss, the intention of the Legislature must be given controlling effect. The statute of descents leaves no room for judicial construction as to the rule of distribution. Where there are no children or their descendants (as in this case), it directs that personal property shall descend and be distributed to the father, mother, brothers and sisters of the deceased, and their descendants, in equal parts.

The instruction given by plaintiff as to the measure of damages was as follows: "3. You are instructed that if you find for the plaintiff you will assess the damages at such sum as you may deem fair and just with reference to the necessary pecuniary injury resulting from such death, not exceeding the sum of ten thousand dollars." It will be seen how nearly its language follows that of section 5427; and it authorized the jury to award plaintiff only compensatory damages. It follows that the only basis in the evidence for the award of $7500 damages was the pecuniary injury of the father and mother resulting to them from the death of their son. As this case is to be remanded for a new trial, it is unnecessary on this appeal to discuss the question whether the judgment for $7500 under the evidence was excessive.

Instruction No. 2 given to the jury authorizing a recovery by the plaintiff was as follows: "If you find and believe from the evidence that the deceased, John Hegberg, was in the employment of the defendant as a brakeman on its freight train running from Springfield to Thayer, Missouri, and that upon arriving at Willow Springs, Missouri, the said John Hegberg together with the other members of the train crew were ordered to make up a train at said place and run the same to Springfield, Missouri, and that at said place there were six cars on a side track, one of which was to be placed on the main track and made a part of the train to be run to Springfield, and if you find that in order to place said car upon the main track it was necessary to remove two other cars immediately south of and in front of said car together with said car to the switch by means of an engine and kick said car upon the main track and thereafter kick the remaining two cars upon the side track, and if you find that said three cars remaining upon the side track after the other three cars had been separated therefrom were loaded cars and that the grade of said side track was downward, south and toward the switchstand, and that the defendant, its agents, servants and employees charged with that duty negligently failed and omitted to fasten and secure said cars and that by reason of said negligent failure and omission, if it was negligent, said cars escaped and ran south thereon and collided with the other two cars near the switchstand, and if you find that the said John Hegberg at the time of said collision was in the discharge of his duties as brakeman and was assisting in kicking said two cars upon the side track near the switchstand and that he was injured by reason of said collision and the negligence and carelessness of the defendant, its agents, servants and employees, as aforesaid, and without fault or negligence on his part and that said injury caused his death and that A. G. Heg-

berg is the administrator of his estate and that said John Hegberg at the time of his death was single and unmarried and over the age of twenty-one years, you will find for the plaintiff.''

The facts presented in this instruction upon which the jury were required to determine defendant's liability were confined to what the jury should believe occurred on the day of the accident. While it is true the instruction requires the jury to find ''that defendant, its agents, servants and employees charged with that duty negligently failed and omitted to fasten and secure said cars,'' the context shows that the duty of fastening the said cars referred to the duty of fastening the three cars on the day of the accident. If plaintiff by this instruction intended to base defendant's liability to any extent upon defendant's negligence in storing the cars on the side track in the first instance and on its failure to securely fasten the brakes on all the cars, the instruction should be so broadened as to cover the necessary facts upon which recovery for such negligence must rest. And further, as deceased was himself a servant of the defendant, the instructions should require a finding of negligence of the agents, servants and employees of the defendant, other than the deceased. To secure a proper administration of the law, it is important that instructions to the jury should be intelligible, couched in plain and unequivocal language so as to be readily understood by them, and thus present the law in clear, plain and concise terms. [State v. Darling, 202 Mo. 150, 100 S. W. 631.]

Defendant's motion in arrest of judgment assigned as a ground that the petition does not state facts sufficient to constitute a cause of action against the defendant.

As we have seen, the petition alleged that the deceased was over twenty-one years of age, single and unmarried, but does not allege that he left no children

surviving him natural born or adopted. It has been held that the allegation in a pleading that a person is single and unmarried does not necessarily mean that such person was never married, and that when the law provides that a proceeding can only be maintained where a party has a child, the charge that such party was single and unmarried but not stating that he had a child or children, was not sufficient. [7 Words and Phrases, 6520, "Single."] The word "unmarried," however, ordinarily means "never having been married," but it is a word of flexible meaning and slight circumstances would be sufficient to give it the meaning that the person has no husband or wife at the time in question. [Peters v. Blake, 48 N. E. 1012; Muller v. Balke, 47 N. E. 355; Frail v. Carstairs, 58 N. E. 401, 403.] The word "unmarried" when applied to an unmarried man or woman commonly implies that the person to whom it is applied has never been married. It may be used of a widow or widower and possibly of a divorced person. [Century Dict., "unmarried."] Hence applying our statutory rule that a pleading should be liberally construed with a view to substantial justice, especially after verdict, the word "unmarried" would properly be held to mean that the deceased had never been married, although over twenty-one years of age, and the charge that he was "unmarried" would be a sufficient allegation that he left no natural children; but the allegation that the deceased was "unmarried" would not be a statement of a fact from which it would naturally be inferred that he did not leave surviving him an adopted child or children. Our law concerning the adoption of children does not require that the father of an adopted child be a married man. [Sec. 1671, R. S. 1909.] The general law is that where the statute does not make any restrictions, an unmarried person may legally adopt a child. [Krug v. Davis, 87 Ind. 590.] To say that the term "unmarried" necessarily carries the

implication that the deceased had no adopted child or children would require us to disregard well-recognized principles of good pleading and interpolate into it constituent facts which the pleader has omitted to state. "In statutory actions of this sort, the party suing must bring himself strictly within the statutory requirements, necessary to confer the right, and this must appear in his petition; otherwise it shows no cause of action." [Barker v. Railway Co., 91 Mo. l. c. 94, 14 S. W. 280; Mathieson v. Railroad, 219 Mo. l. c. 548, 118 S. W. 9.] The attention of the trial court was distinctly called to this question in defendant's motion in arrest of judgment. This was sufficient. While the appellate court will indulge every presumption in favor of the jurisdiction of the trial court and give a liberal construction to the pleadings with a view to substantial justice, yet the requirement that the petition shall state a cause of action is indispensable and cannot be waived. A petition that does not state a cause of action is always open to review, at every stage of the case, at any time in any court, whether raised by demurrer or not. [Hudson v. Cahoon, 193 Mo. l. c. 558, 91 S. W. 72; Hanson v. Neal, 215 Mo. l. c. 278, 114 S. W. 1073.] Our statute has made a distinction between matter of error and exception. The record proper by law, is the petition, and subsequent pleadings, including the verdict and judgment. Section 2083, Revised Statutes 1909, has made it our duty, independent of any action of the attorneys, to examine the record, and if any error is apparent on the face of the record, to reverse the judgment *sua sponte* whether any exception is taken or not. [Bateson v. Clark, 37 Mo. l. c. 34; Broughton v. Brand, 94 Mo. l. c. 169, 7 S. W. 119; St. Louis, K. C. & C. Ry. Co. v. Lewright, 113 Mo. l. c. 669, 21 S. W. 210.] This has been the law of this state ever since the revision of the laws in 1885 and has been sanctioned by repeated decisions.

Other errors have been assigned by appellant as to the giving of instructions, refusal of requested instructions, and to the admission of evidence. These assignments have received consideration and are overruled as not prejudicially affecting appellant's substantial rights.

It follows from what has been said that the judgment must be reversed and the cause remanded, and it is so ordered. *Gray, J.,* concurs in the result. *Cox, J.,* concurs in the result and files separate opinion.

## SEPARATE CONCURRING OPINION.

COX, J.—I.   I concur in reversing and remanding this cause but place my concurrence upon the ground that since the measure of damages upon which the case went to the jury was compensation alone, the verdict is excessive and the judgment should be reversed for that reason.   Since the case is to be retried, the petition should be so amended as to clearly state facts which show the right of the administrator to sue under the fourth subdivision of section 5425, Revised Statutes 1909, and the trial should be conducted in harmony with the view expressed in the opinion of Presiding Judge NIXON.

II.   On the question of contributory negligence the jury should be told in plain terms that if they should find from the evidence that it was the duty of deceased Hegberg to see that the three cars left standing on the switch had sufficient brakes set to hold them in place while the switching was being done and he failed to perform that duty then he could not recover, and this without any reference to the specific duty of the conductor for there is no evidence that the conductor was in any way negligent in this case.

III.   The printed rule offered in evidence does not require the brakes to be set on all cars placed upon

a side track at the time they are placed there, but only requires that sufficient brakes be set to hold them in place.  *Gray, J.,* concurs in paragraphs 2 and 3.