**S. S. NUCKOLS and Helen Nuckols,**
**Plaintiffs-Respondents,**

v.

**ANDREWS INVESTMENT COMPANY,**
**a Corporation, Defendant-Appellant,**

and

**Andrew J. Johnson and Eileen M. Johnson,**
**Defendants-Respondents.**

**Nos. 23615, 23617.**

Kansas City Court of Appeals.

Missouri.

Dec. 3, 1962.

Claude M. McFarland, McFarland, Ritt-man & Krimminger, Walter A. Raymond, Raymond, West & Cochrane, Kansas City, for appellant.

James W. Benjamin, Thomas E. Sims, Rogers, Field & Gentry, Kansas City, for plaintiffs.

Robert G. Oberlander, Kuraner, Freeman, Kuraner, Oberlander & Lamkin, Kansas City, John B. Yeaman, Platte City, for respondents.

HUNTER, Presiding Judge.

Plaintiffs-respondents, S. S. Nuckols and Helen Nuckols, obtained a judgment for $15,000 for the wrongful death of their minor son, William, against defendant-appellant, Andrews Investment Company, a corporation.

William Nuckols was killed on July 11, 1960, while employed on a farm in Platte County, Missouri, by defendants-respondents, Andrew J. and Eileen M. Johnson. Decedent was found on a tractor in the hole of a collapsed low water dirt and concrete bridge on the farm.

The jury's verdict was against defendant Andrews Investment Company and was in favor of defendants, Andrew and Eileen Johnson. Andrews Investment Company

has appealed seeking an outright reversal or at least a new trial, and plaintiffs, admittedly solely as a precautionary measure, and only in the event of success in this appeal by Andrews Investment Company, seek to have the judgment amended or modified so as to make it a joint judgment against all the defendants or in the alternative seek a new trial as to defendants Johnson on the question of liability alone.

None of the defendants offered any testimony at the trial, preferring to stand on their unsuccessful respective motions for a directed verdict. On this appeal they urge numerous contentions, including (1) failure of plaintiffs to make a submissible case; (2) contributory negligence as a matter of law on the part of decedent; (3) prejudicial error in certain instructions and (4) excessiveness of the verdict.

Specifically, the first charge of error of Andrews Investment Company, hereinafter sometimes referred to as appellant, is that "The evidence failed to establish that this defendant owed any duty to the decedent (because) (1) This defendant had no control or right of control over the bridge involved; and (2) Decedent's rights against this defendant are only coextensive with that of his employer."

■ On this contention involving submissibility, it is our duty to review the pertinent evidence in the light most favorable to plaintiffs and to give them the benefit of every inference reasonably deducible therefrom. This we proceed to do.

Andrews Investment Company in 1959 was the owner of a farm located just east of Highway 71 in Platte County, Missouri. A private road entered the farm from the highway, through a gate, on past a farm house and dairy barn, and about a block farther on crossed a low water bridge running west to east over Owl Creek to where there were located fee fishing lakes and cottages, one of which was occupied by the Johnsons and decedent. This road was the only practical way from Highway 71 to the Johnson Cottage.

Appellant had owned and farmed the land for several years prior to the Johnsons' possession of it. During that earlier time appellant had caused to be erected and had used two other bridges over Owl Creek but because of damage from occasional flooding of the creek had to replace them. Its president, Mr. Andrews, stated, "That type of soil down there just washes and erodes down and gets wider all the time and we just couldn't keep a bridge in there." Andrews gave his ideas to the builder as to how the third bridge should be built and it was built according to his suggestions including the number of tubes to be used, how large they should be, their location, and the packing of dirt and concrete over them. He told the contractor just what was wanted and the contractor did the work accordingly. Andrews knew that trucks and other heavily loaded vehicles would be using this new bridge.

The new bridge consisted of two large culvert pipes covered by earth fill with four to eight inches of concrete over it so as to form a bridge about 35 feet long and 12 or 14 feet wide. It was a low water bridge designed to permit the water to flow through the culvert pipes under it at low water stages, and also to flow over it in high water stages. The surface of the bridge was about five to eight feet above the bottom of the creek. Other than problems caused by washout or erosion is was an adequate bridge for farm use. It appeared to be solid and without defects when the Johnsons moved to the farm. It was used extensively by Mr. Johnson and decedent in order to move farm equipment from one side of the creek to the other as was often necessary in the farming operation. It was also used extensively by members of the public in getting to the fishing lakes operated by the Johnsons on the farm and by tradesmen making deliveries to the farm. The following picture of this bridge was taken shortly after the accident in question.

The Johnsons had lived near the farm and knew appellant desired to sell it. They had little money. Nonetheless a deal was arranged. On July 29, 1959, they executed a written "sale" contract with appellant. This contract in ultimate effect can be loosely termed to be a rental arrangement with an option to purchase. The appellant agreed to sell and the Johnsons agreed to purchase. The stipulated purchase price was $60,000. The Johnsons had until February, 1962, to exercise the option by giving notes payable ten years from February 13, 1962, secured by a purchase money trust deed on the premises. For the privilege of use and occupancy prior to February, 1962, (option termination date) the Johnsons were to pay 5% interest on $60,000 at the rate of $250 per month, an additional monthly cash payment of $121.12 commencing March 15, 1960, as the estimated sum required to pay taxes and insurance on the farm, and, if not sufficient therefor, were to pay whatever additional was required for such taxes and insurance; any excess to be returned to them.

One clause of the contract is of special interest. It (Clause 10) provided, " * * * that the purchasers have the option, right and privilege of cancelling and nullifying this contract on February 15, 1962, upon giving ninety days' written notice to the seller. * * * In consideration of such option and privilege and in the event of such cancellation of this contract by the purchasers at said time, they agree and promise to at that time purchase from the seller the farm machinery and equipment hereinbefore mentioned and described, and pay the seller Two Thousand Dollars ($2000.00) in cash for said property (machinery)."

The above mentioned deed and deed of trust were to be executed by the parties and put into escrow with the Bartlett Mortgage Company to be recorded if the contract was not cancelled on or before February 15, 1962, and they were executed.

In September, 1959, Mr. Johnson plowed the farm. He and his wife moved onto it on January 10, 1960. Mr. Johnson had known Butch (decedent) from March, 1954, and Butch had worked for him off and on since 1956. In April, 1960, Butch went to work for the Johnsons as a regular farm hand for $80.00 per month, plus room and board, and was so employed at the time of his death on July 11, 1960. Butch was then 18 years and 8 months old, and would have graduated from high school the following year.

In the latter part of June, 1960, there were some heavy rains, and considerable water passed over the low water bridge. Mr. Johnson noticed what appeared to be the commencement of a washout on the west side of the bridge, a hole several feet in diameter. He asked Butch to haul a load of rock to fill it in. Later, at lunch Butch told him the hole was so big he could stand with his feet in the bottom of the creek and barely reach the top. Because Mr. Johnson had thought the bridge was solid concrete he didn't understand Butch's report, and that very noon went down to inspect the bridge. He observed the washout described. That night there was more rain and again Mr. Johnson inspected the bridge, noticing that for the first time the concrete had a small crack across it parallel to the west bank near the west end, and that there was a settling of a quarter to a half inch at the outside of that crack. He or Mrs. Johnson then telephoned Mr. Andrews, President of the Andrews Investment Company and reported the situation of the washout and damaged bridge to him. Mr. Andrews came there that same day to inspect the bridge. Before his arrival Mrs. Johnson made a sign reading, "No trucks allowed on crossing, Pepsi Cola and 7 Up honk horn". Mr. Johnson placed this sign a block ahead of the bridge so that the sign faced Highway 71. Mr. Johnson tried to stop all "heavy traffic" at the gate. Bread trucks and Coca Cola trucks would stop at the gate and he or his wife would meet them there. He (Johnson) stated he realized there was some degree of danger because he put this sign there about the trucks.

When Mr. Andrews arrived to inspect the bridge he observed the crack across it. It was large enough that he could stick his finger into the open part of it. He noticed the bridge had settled some. He observed the tubes had settled some. He crawled in under the bridge, "crawled through the tube and I looked it over carefully, I will tell you that." He saw that the dirt underneath the tubes had washed out so that the water flowed under and around the tubes instead of through them. He then had a discussion with Mr. Johnson as to what to do about it. At that time he was undecided whether to repair it by leaving the tubes, tear out some cement and fill back in with dirt and cover that again with cement or to fix it some way without the use of tubes. He realized that the bridge in the condition he observed was dangerous. Apparently the discussion also included temporary repairs, Mr. Andrews wanting to discuss the matter of more permanent repair with a friend Mr. Albert Bartlett. Mr. Andrews suggested to Mr. Johnson that meanwhile if they were going to use the bridge "to lay those planks (from the formerly torn down wooden bridge) down there and then cross on the plank and use that plank for support." He cautioned Johnson that "if he crossed it at all to put those planks there. I thought possibly if he would put those planks there he could *maybe* drive across it some." "Q. And as Mr. Johnson said this morning, did you suggest that he get some of that bridge planking and take it down there and make a temporary brace across that cracked concrete? A. Yes, just merely going across on the plank, just ride the plank across." Mr. Johnson and Mr. Andrews "agreed that these planks should be put across there because there was again some degree of danger."

Then Mr. Andrews took a plank and he and Mr. Johnson dragged it into place across the crack. " * * * and then (later) he (Johnson) got some more." (Mr. Johnson testified that the second time Mr. Andrews was at the bridge he and Andrews dropped one plank across.)

Later, Mr. Andrews returned to St. Joseph and "talked to Al (Albert Bartlett) and the boys about it and we knew something had to be done, and then I took Albert with me. I don't think Johnson went that date. I think Al and I went alone." On his second visit he observed Mrs. Johnson cross the bridge with a boat on a trailer. "And then about the third time (they visited the bridge) Thomas (city engineer) went with us." Mr. Thomas recommended the Clark Construction Company to rebuild the bridge. That company at an undisclosed later time was employed by appellant to put in a new bridge. It commenced building the new bridge after the accident but before the Johnsons cancelled the contract and moved off the farm on December 15, 1960.

Mr. Andrews undertook to explain why appellant undertook to repair the bridge— " * * * we had to protect our investment * * * when you sell a farm on a contract like that, naturally you have to stay in there. That was our problem." Any time before February, 1962, "He (Johnson) could quit. Q. Throw in the sponge? A. Sure he could. Q. And the property was yours, wasn't it? A. Right. Right."

From the time Mr. Johnson first observed the crack and washing out he, his wife, decedent and customers and tradesmen continued to use the bridge. Mr. Johnson and decedent both continued to operate Mr. Johnson's farm equipment across it, including his ton and a half truck, his two tractors and his passenger automobile. Mr. Johnson, in accordance with Mr. Andrews' conversation, had Butch hook some planks on the tractor one night and he and Butch dragged them to the bridge. Mr. Johnson placed them over the crack.

On the evening of the accident Mr. Johnson drove his International tractor across the bridge up to the milking barn. Later Butch, who had just returned from a Sunday visit with his family joined him there. Previously, Mr. Johnson had ordered a ton of carp fish to restock some of the fishing

lakes. Shortly after Butch's arrival they saw the fish truck on its way just past the gate a block from the bridge. They watched its lights as it crossed the bridge apparently without a bobble. Mr. Johnson knew it was a very heavy fish truck that would have some carp in it, a ton of which was going to (him). Mr. Johnson said, "'I imagine' one of us ought to go down and help to unload the fish', and he (Butch) said, 'I will go.'" Decedent then got on the tractor and started toward the house. That was the last Mr. Johnson saw of decedent. It was customary for both decedent and him to use that tractor to go back and forth from the barn to the house, across the bridge.

About twenty minutes later a neighbor notified him of the accident. Butch was down in the hole of the bridge which had collapsed, and was still on the tractor. He was dead. His death was occasioned by his head being caused to strike and be pinned against the steering wheel of the tractor.

In his brief appellant's attorney acknowledges that the amended petition on which the case was tried charged that appellant has joint control of the bridge and its repair with the Johnsons and that "we (appellant) negligently performed the repairs to the bridge."—as did Mr. Johnson also, and that the death came about as a direct result of the joint and concurring negligence of all the defendants.

Appellant also states in its brief, "The relationship here between this defendant and the Johnsons is either that of vendor and vendee or landlord and tenant. It is immaterial which it is here as the duties and obligations of the parties here are the same whether it is a sale or a lease." Appellant then cites and relies on numerous cases concerning the lack of duty on the part of a landlord, who is totally out of possession and control of the premises, to a tenant and the tenants' employees, invitees and guests, to make ordinary repairs to the premises and his freedom from liability for personal injuries incurred because they were not made. Typical is Gray v. Pearline, 328 Mo. 1192, 43 S.W.2d 802, 804, stating, "In the absence of an agreement by the landlord to put and keep the premises in repair, no duty is imposed upon him, or implied, to make ordinary repairs to demised premises. * * *." We thoroughly agree with these cases. However, they do not rule the case before us, for the facts and principle of law involved are entirely different.

■ We believe the applicable rule to be that while a landlord, in the absence of a contract to do so, is under no obligation to his tenant to make repairs on the demised premises, yet if he voluntarily does so for his own or for the common advantage of both himself and the tenant, he must use reasonable care in doing so, and is liable for any injury caused by his negligence in doing so. For authorities supporting this statement, see Bloecher v. Duerbeck's Estate, 333 Mo. 359, 62 S.W.2d 553, 555, 90 A.L.R. 40; Finer v. Nichols, 175 Mo.App. 525, 157 S.W. 1023; Patton v. Eveker, Mo.App., 232 S.W. 762; Lasky v. Rudman, 337 Mo. 555, 85 S.W.2d 501; Kennedy v. Bressmer, Mo. App., 154 S.W.2d 401.

The reason for the above stated duty is set out in Bartlett v. Taylor, 351 Mo. 1060, 174 S.W.2d 844, 847: "* * * if the landlord does undertake to make repairs, either voluntarily or by covenant, he must exercise reasonable care in doing so and is liable to his tenant for injuries caused by his negligence or unskillfulness in making the repairs or in leaving the premises in an unsafe condition. * * * (Reviewing Missouri cases.) * * * Chief Judge Cardozo said: 'The landlord, though a volunteer in making the repairs, is liable, none the less, for negligence in making them. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all". * * * A landlord in these circumstances is not charged with liability on the basis of the nonperformance of a voluntary promise. He is charged with liability, because, having chosen to perform,

he has thereby become subject to a duty in respect of the manner of performance. * * There is a suggestion, * * * that to make the landlord liable, the negligent repairs must have aggravated the defect, so that what was dangerous before became more dangerous than ever. We cannot yield assent to this restriction of the field of duty.' "

And in 52 C.J.S. Landlord and Tenant, § 417c(2), page 43, it is expressed "The general rule is that, where the landlord is under no obligation to make repairs, but undertakes to make them gratuitously, he is under a duty to use reasonable care and will be liable for his negligence in making such repairs. The basis of the landlord's liability when he gratuitously but negligently makes repairs is determined by the law of torts and not by the law of contracts; liability is predicated on the common-law doctrine that a volunteer may not do what he undertakes to do in a negligent manner or in any manner from which negligence might reasonably be inferred. The landlord voluntarily undertaking to repair impliedly assures the tenant that the repairs are properly made and that the previous defective condition has been remedied. In order to render the landlord liable it is not necessary that he shall have made the physical condition of the premises more dangerous."

■ Plaintiffs' verdict directing instruction submitted in the conjunctive the issues both (a) of the exercise of joint control of the bridge by Andrews Investment Company and Johnson and (b) of the assumption of the obligation by Andrews Investment Company to repair it. The jury found for plaintiffs under this submission and the trial court in a well reasoned memorandum opinion agreed with the jury's findings. We find that the evidence was sufficient to support a submission of both of these issues to the jury, and we find no merit in appellant's contentions to the contrary.

We briefly summarize some of the evidence from which the jury could have found joint control and an undertaking to make the repairs. On the issue of joint control: (1) Record title was in appellant; (2) The continuation by appellant of an insurance policy in which appellant designated itself as owner of the farm; (3) Mr. Andrews' statement that his company had to stay in there to protect its property; (4) The actions and statements of Mr. Andrews as to the history of the bridge; (5) His immediate response to the telephone call advising of the washout and cracking of the bridge; (6) His three visits to inspect it and to arrange its ultimate repair or replacement; (7) Appellant's replacement of the bridge at a time the Johnsons still occupied the premises under the written agreement; and (8) Andrews' statement as to how to temporarily repair it and his directions to Johnson and his placing a plank over the crack. All these things together and especially Andrews recognizing the reality of the situation occasioned by the contract, are sufficient for the jury reasonably to infer and find as a fact that appellant actually exercised at least a joint control and joint right of control of the bridge and its maintenance and repair and participated in and helped direct its temporary repair.

What we have already said disposes of appellant's contention that there was no substantial evidence to support plaintiffs' verdict directing instruction and that it incorrectly stated the law.

■ We also find no merit in appellant's contention that the evidence did not make a submissible issue of any negligence on the part of defendant which was the proximate cause of the death of decedent. Mr. Andrews acknowledged the washed out and cracked bridge presented a dangerous situation to a user. There was evidence from which the jury could find appellant negligent in participating in and directing an inadequate temporary repair of the bridge and that decedent's death was the result of such negligence. We rule that on the record before us the question of proximate cause was properly one for the jury.

Next presented is the contention that decedent voluntarily incurred the risk of using the bridge on the occasion of the accident and was guilty of contributory negligence as a matter of law. The trial court submitted to the jury appellant's instruction on this subject and the jury found against appellant.

It is the accepted rule that the determination of whether a person is guilty of contributory negligence ordinarily is for the jury as within its function unless it can be said from all the evidence and the reasonable inferences therefrom viewed in the light most favorable to that person that the *only* reasonable conclusion is that he was negligent and that his negligence was a proximate cause of the injury.

Here, we have an eighteen year old boy who apparently was relying on the temporary repair made to the bridge. He had observed his employer use the damaged bridge by driving a 1½ ton truck, tractors and a passenger car over it. He, himself, had driven at least some of this equipment over it without mishap. His employer less than two hours before the accident had driven the very tractor in question over it. He had observed the heavy fish truck cross it just moments before the accident. The expressed attitude of both his employer and Mr. Andrews seemed compatible with further use of the bridge by decedent. True, decedent knew of the washout and the crack across the bridge, and even to some extent participated in the temporary repair work by hauling boards to the bridge to be placed over the crack. Yet, viewing the evidence as a whole we conclude reasonable minds could differ on the question of contributory negligence and that the issue was properly for the jury. Language used in Bartlett v. Taylor, supra, 174 S.W.2d loc. cit. 851, (concerning use of a door rather than a bridge) aptly expresses our feeling, " * * * but considering that he had some right to rely on the assurance of safety implied in the repairs we cannot say that he had such comprehension of the risk of involved in using the door with its defective repairing that reasonable minds could draw but the one conclusion that he fully appreciated the danger and proceeded in utter disregard of the consequences. The conclusion and inference from the evidence is also permissible that he did not appreciate the peril to which he was subjecting himself, in using the door and, therefore, whether he was contributorily negligent was a matter to be resolved by the jury."

Appellant complains that the verdict and judgment is inconsistent, contradictory and self-destructive because it exonerates the Johnsons yet is against appellant. Appellant argues the evidence concerning fault or negligence is much stronger against Mr. Johnson than appellant and hence the verdict and judgment is the product of misunderstanding, bias or prejudice. The trial court ruled against this contention.

The answer to appellant's complaint is that each defendant was the subject of a different submission to the jury. Appellant was charged with acts of direct negligence in making repairs while the Johnsons were charged with negligent failure to provide a reasonably safe place for decedent to work. Plaintiffs chose to submit two different theories of negligence in separate verdict directing instructions. It is not necessarily factually or legally inconsistent that the jury exonerated one and found against the other. See, Ciardullo v. Terminal Railroad Ass'n. of St. Louis, Mo.Sup., 289 S.W.2d 96, 61 A.L.R.2d 516; Page v. Hamilton, Mo.Sup., 329 S.W.2d 758. Each defendant was sought to be held for his own negligence, and not for the negligence of some one else as in certain master and servant cases where the master is sought to be held solely for acts of his servant under a theory of derivative liability. The fact that the Johnsons were more successful in persuading the jury to exonerate them, under the circumstances presented is of no legal aid to appellant. See, Clark v. Simmons, Mo.Sup., 351 S.W.2d 1, 6. And the plaintiffs are not

complaining that there is any inconsistency of such a nature as to destroy their verdict against appellant.

During the trial plaintiffs' counsel offered in evidence on the issue of Andrews Investment Company's ownership and joint control of the farm and bridge a current liability insurance policy in which the investment company stated it was the owner of this and two other farms. Before ruling on the offer the trial judge inquired of appellant whether it still denied both ownership and joint control of the premises, and upon being assured that it did, overruled the objection and received the policy in evidence. Plaintiffs' counsel was then permitted to read to the jury those portions of the policy containing the ownership statement. It was suggested to appellant's counsel by the court that if he desired to have the court instruct the jury limiting the evidence to the issues of ownership and joint control the court would do so. Appellant's counsel declared he did not want a limiting instruction, and now assigns the admission of this evidence as error.

■■ Notwithstanding the general rule against the introduction of evidence declaring or suggesting that the defendant is protected by liability insurance, such disclosure or suggestion will not be avoided at the cost of supressing evidence material to the establishment of a cause of action and the liability of the defendant. See, Annotation, Showing As To Liability Insurance, 4 A.L. R.2d 761, 775, 777; 20 Am.Jur., Evidence, Sec. 263, page 252, and Cumulative Supp., Sec. 390, page 68. Under such circumstances the rule is applied that where evidence has probative value on a material, controverted issue and is otherwise admissible thereon but would be improper for other purposes or other issues in the case, it should be received. The opponent then has the right to an instruction if he should request it limiting extent to which and the purpose for which the jury may consider such evidence. Turner v. Caldwell, Mo. App., 349 S.W.2d 493(4–5); Hannah v. Butts, 330 Mo. 876, 51 S.W.2d 4, 7; Martin

v. Mercantile Trust Co., Mo.Sup., 293 S.W. 2d 319(14).

■ As stated by Judge Conkling in State ex rel. Cummings v. Witthaus, En Banc, 358 Mo. 1088, 219 S.W.2d 383, 389, 8 A.L.R.2d 1124, "In determining whether certain evidence is material, relevant and admissible the courts apply the simple test of whether it tends to prove an issue. If the particular evidence does tend to prove an issue formed by the pleadings, that evidence cannot be excluded merely because it may also tend to show that some one carried liability insurance on the particular motor vehicle, or any motor vehicle."

■ This court in Paepke v. Stadelman, 222 Mo.App. 346, 300 S.W. 845, held, where defendant's ownership of the car which struck plaintiff was denied and was a part of plaintiff's case, any evidence tending to show such ownership including indemnity insurance on it is admissible. In the light of this well established authority, we find no merit in appellant's contention.

■ Nor did the trial court commit reversible error in giving plaintiffs Instruction No. V on the measure of damages along with defendant Johnson's cautionary instruction thereon. Instruction No. V instructed the jury that if they found for plaintiffs then in assessing the damages they will award such sum of money, if any, as will fairly and reasonably compensate the plaintiffs for their pecuniary loss directly resulting to them from the death of their son. The instruction is not erroneous and in substance has been approved on prior occasions. See, Gain v. Dorward, Mo.App., 357 S.W.2d 193, 194; Morton v. Southwestern Telegraph & Telephone Co., 280 Mo. 360, 217 S.W. 831, 836.

■ Codefendants Johnson sought and obtained a cautionary Instruction No. 10 to the effect the damage award could not in any event be greater than the sum decedent was reasonably capable of earning from the

date of his death until the date he would have become 21 years old, plus funeral expenses reasonably incurred by plaintiffs by reason of the death of their son. Appellant charges Instructions V and 10 are inconsistent, confusing, misleading and erroneous. We do not think so. The real burden of appellant's complaint is that it thought the damage instructions too general and desired one specifically directing the jury that in assessing the damages the jury should deduct the expense of the support and maintenance of the child during the time in question. Damage instruction No. V was a correct one even though general, and if appellant wished an additional, substitute or cautionary instruction on this point it should have requested it.

■ Prior to the trial depositions of appellant's president, Mr. Andrews, were taken. At the trial when plaintiffs' counsel stated he wished to read in evidence page 3, line 15 through 19, of Mr. Andrews' deposition, appellant objected "to the reading of those questions for the reason they are not an admission against interest." To some other questions he continued to say, "Same objection". Later he objected that "the questions and answers asked on (page 32 of the deposition) are not competent testimony to prove or disprove any of the issues in the case." At a later point he stated, "I don't see where a lot of these questions qualify as admissions against interest." As to questions on pages 32 to 34 of the deposition he objected, "too remote" and "each answer does not qualify as an admission against interest." As to a question on page 42, line 1, he objected that it was "no admission against interest— too remote from the issues here involved, and is not binding on this defendant. Some of it is hearsay."

On this appeal appellant charges the trial court with reversible error in reading portions of the depositions of Mr. Andrews as admissions against interest of appellant "as he was not acting in the scope of his authority and line of his duty in giving his deposition at the request of defendants Johnson." [1]

Plaintiffs contend appellant's present contention of error is substantially different from any objection made by appellant at the trial to the evidence and that therefore it is not properly before this court for appellate review; that the objections made to the trial court failed to advise it that the basis of appellant's objection to the reading of the mentioned questions and answers was that Mr. Andrews was not authorized to make admissions in the deposition and was not acting within the scope of his employment in giving the deposition.

However, we need not pass on either the question of the adequacy of the objections to preserve the present contention of appellant or the question of whether the statements of Mr. Andrews read from his deposition were properly admissible in evidence. For there are additional and sound reasons why appellant's appellate contention cannot be deemed to be meritorious. The statements made by Mr. Andrews in his deposition were but cumulative to and explanatory of the admissions of appellant Andrews Investment Company which were read in evidence from the answers to interrogatories which appellant filed in court under the signature of Mr. Andrews. In the main they were duplicated by testimony given by Mr. Johnson, and essentially undisputed. In fact, appellant's counsel in his opening statement to the jury in effect conceded practically all of them.

1. On this subject, see Loyal's Auto Exchange v. Munch, 153 Neb. 628, 45 N.W. 2d 913, 921(12); Brown v. Kroger Company, Mo.App., 358 S.W.2d 429, 434; Brown v. Kroger Company, Mo.Sup., 344 S.W.2d 80(17); Kaufman v. Baden Ice Cream Mfgs., Inc., Mo.App., 7 S.W.2d 298(3–4); Bowyer v. Te-Co., Inc., Mo. Sup., 310 S.W.2d 892; and especially, Meyer v. Dubinsky Realty Co., Mo.App., 133 S.W.2d 1106(10); Kolb v. Howard Corp., Mo.App., 219 S.W.2d 856(3); Winegar v. Chicago B. & Q. R. Co., Mo. App., 163 S.W.2d 357(11–14).

Thus even if appellant's present contention was reviewable appellant has failed to demonstrate that any prejudice could or did result from the reading in evidence of any particular portion of the deposition.

■■ The testimony as to the replacement of the bridge by appellant after the casualty, but before the Johnsons terminated the lease, was not erroneously received, for it tended to show appellant had retained and exercised some control of the premises. As stated in Brule v. Mayflower Apartments Co., Mo.App., 113 S.W.2d 1058, 1060: "Different situations arise where evidence of the defendant's subsequent repair or improvement of the premises, though incompetent upon the issue of his negligence, is nevertheless admissible in proof of some other fact or circumstance in the case, as, for instance, where the evidence is admitted for the purpose of showing that the thing or place which caused the plaintiff's injury was under the defendant's management and control." And see, Wright v. Hines, Mo.App., 235 S.W. 831, 832; Benton v. City of St. Louis, 217 Mo. 687, 118 S.W. 418,. 424; Annotation, 64 A.L.R.2d 1296.

■ Appellant charges that the verdict was the result of bias and prejudice induced by misconduct of both the counsel for co-defendants and for plaintiffs. Again appellant's counsel has generalized and has failed to call our attention to any particular ruling of the trial court that it deems to be prejudicially erroneous. After referring to the question of the use in evidence of a portion of the insurance policy, which subject we have previously discussed, appellant's counsel alludes to audible and frequent sobbing of decedent's mother which allusions are not supported by the record. Nor with reference to the presence of decedent's mother at the trial can we find where appellant ever requested the trial court to take any action which the court failed to take. We have examined the transcript, which fortunately includes closing argument of counsel, and find no

merit in this contention of reversible error. It would needlessly prolong this opinion and serve no useful purpose to set out further the conduct to which appellant has referred.

■ We next discuss another contention of error with reference to plaintiffs' Instruction VI on the subject of contributory negligence. It provided that "* * * if you (the jury) find that by reason of his age the deceased Nuckols' boy did not have the capacity of an adult, and that he exercised such care that ought reasonably to be expected of one of his age and capacity, then he was not guilty of contributory negligence. * * *" Appellant contends an eighteen year six months old boy is not entitled to be judged by any standard of care other than that of an adult. In the cited case of Coleman v. Himmelberger-Harrison Land & Lumber Co., 105 Mo.App. 254, 79 S.W. 981, the court deemed an instruction erroneous, saying, "It is not correct to say that the law does not exact of one who is a minor that care and caution that it demands of an adult. * * * The care a minor is bound to use is that care that persons of his age, capacity, and intelligence are capable of using in like circumstances. (citations) There is no arbitrary rule fixing the age when a youth may be declared wholly capable of understanding and avoiding danger. Barney v. [Hannibal & St. J.] Railway [Co.], 126 Mo. 372, 28 S.W. 1069, 26 L.R.A. 847. Yet it seems to us that a youth 18 years of age, of ordinary intelligence and experience, should show some incapacity, in addition to his minority, to warrant a court in instructing, as a matter of law, that he was not required to use the same care as an adult."

This portion of the instruction was "lifted" from Raymond, Missouri Instructions, Sec. 8424, where it was taken from Hall v. Missouri Pac. Ry. Co., 219 Mo. 553, 118 S.W. 56, 62. The instruction does not declare that decedent was not required to use the same care as an adult. Rather, it declared that only if the jury found from the evidence that decedent did not have

the capacity of an adult, then, in such event, he was to be measured by "such care that ought reasonably to be expected of one his age and capacity." The record is replete with testimony concerning decedent's ability, capacity, experience and education. We do not deem the instruction to be in conflict with the standard seemingly required in the Coleman case, supra, and the giving of the instruction so worded did not prejudice any right of appellant.

There is an earlier portion of the instruction that is subject to criticism. It provided that "the law presumes that said deceased was in the exercise of ordinary care, in the absence of evidence to the contrary." This phrase, unhappily, was also "lifted" from Raymond, Missouri Instructions, Sec. 3228. For an understanding of plaintiffs' position we quote their brief, page 40:

"Author Raymond cites as support for this instruction which is advanced as a model to the lawyers, litigants and courts of Missouri, the case of Hegberg v. St. Louis & S. F. R. Co., 164 Mo.App. 514, 147 S.W. 192, in which that language was used in an instruction which was quoted and approved by the court on appeal * * * the Shepardizing of the Hegberg case, supra, would and does not reveal that the case has ever been overruled on the use of this instruction, nor does the reader even find the criticism of such instructions which the advocates in this case advance as a reason for such prejudice as to require a reversal of this judgment. Thus the model instruction in Raymond and the Hegberg case apparently stand in the law of Missouri as a submerged iceberg—a trap for the unwary who having followed the instruction to the letter as approved by the court in Missouri, then find after verdict that they are met with the advocates' claim that such instruction is so horribly prejudicial as to require a reversal of the result. The fact that judges do not agree in every instance that the use of the presumption language is somehow magically prejudicial is seen from at least two recent Supreme Court cases: Curtis v. Atchison,

T. & S. F. Ry. Co., Mo.Sup. [363 Mo. 779], 253 S.W.2d 789, 794(6) and Younkman v. Missouri Pacific Railroad Company, Mo.Sup., 304 S.W.2d 19, 20."

■ Plaintiffs' counsel now apparently realizes that it is improper in a civil case to instruct as to any presumption where there is evidence on the subject, *and it should not be done*. See Vinson v. East Texas Motor Freight Lines, Mo.Sup., 280 S.W.2d 124, 131; McKenna v. Lynch, 289 Mo. 16, 233 S.W. 175; Lebow v. Missouri Public Service Co., Mo.Sup., 270 S.W.2d 713; Neve v. Reliance Insurance Company of Philadelphia, Mo.App., 357 S.W.2d 247, 250(8).

■ The effect of instructing on a presumption where there is evidence on the subject is stated to be "sometimes useless, sometimes prejudicial, and always illogical." McKenna v. Lynch, supra, 233 S.W. loc. cit. 176. Such an instruction is not always prejudicially erroneous so as to necessitate a reversal. Each case must be carefully examined to determine its effect in that particular case

■ Of relevance to our consideration as to whether the instruction as used in this case is prejudicially erroneous is the rule that instructions are to be read in combination and as an entirety and courts must look at the whole charge to ascertain if a jury, composed of ordinarily intelligent laymen, reading all of the instructions together would or would not be misled. Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 732(7-8). Plaintiffs' verdict directing instruction (on which plaintiffs assumed the burden of proof) required a finding "from the evidence * * * that plaintiffs' son was at all times in the exercise of ordinary care for his own safety" in order for plaintiffs to recover. Instruction No. B. given at the request of appellant provided: "The court instructs the jury that it was William Roland Nuckols duty to exercise ordinary care and caution for his own safety at all the times mentioned

in the evidence and that if you find and believe from the evidence that before attempting to cross the bridge, William Roland Nuckols knew, or in the exercise of ordinary care should have known, that the condition of said bridge was such that it was not reasonably safe for use at the time and under the circumstances he attempted to cross it on the tractor mentioned in the evidence, if you so find; and that if you further find that William Roland Nuckols was negligent and careless in attempting to cross the bridge on the tractor under the circumstances then and there existing; and that if you further find that such carelessness and negligence on the part of William Roland Nuckols directly caused or contributed to cause his death, if so, then your verdict must be for the defendant Andrews Investment Company and against the plaintiffs in this case. * * "

Instruction No. 2 given at the request of the Johnsons to the jury read in part:

"The Court instructs the jury that under the law of Missouri it was the duty of Roland Nuckols to exercise ordinary care for his own safety at the time and place mentioned in evidence.

"In this connection, if you find from the evidence either that on the evening of July 11, 1960, Roland Nuckols knew or that in the exercise of ordinary care he could have known that the bridge or crossing mentioned in evidence was not reasonably safe for travel by one riding the tractor. * * * " the jury should find for defendant.

Additionally, challenged Instruction No. VI stated in effect that the mentioned presumption regarding ordinary care applied only if there was no evidence of lack of ordinary care. There was considerable evidence both pro and con on the issue of lack of ordinary care (contributory negligence). Hence, a literal reading of the instruction and a literal application of it to the evidence would result in the jury not applying any presumption for there was not an "absence of evidence to the contrary".

We have reached the conclusion that while the instruction is not properly drawn, the jury was not misled. We are convinced no *prejudicial* error resulted. Cf. Elmore v. Kansas City, Mo.App., 333 S.W.2d 795, 797.

It is regrettable that plaintiffs' attorney offered the instruction in its present form, and that defendants made only general objections to it at the time it was offered. The transcript shows that the first objection of the nature presented here came in appellant's motion for new trial when it was too late for the trial court to take any corrective action other than the drastic one of granting a new trial which was not warranted. And since we cannot say as a matter of law that error prejudicial to appellant resulted in this case from the giving of the instruction the point is ruled against appellant.

We reach appellant's final contention; namely, that the $15,000 verdict was excessive under the evidence. The method of ascertaining proper damages for the wrongful death of a minor admittedly lacks mathematical nicety under our present law. It has been criticized by some who prefer the present view of the courts of the States of Michigan and Minnesota. See, Wycko v. Gnodtke, 361 Mich. 131, 105 N.W.2d 118; and Fussner v. Andert, Minn., 113 N.W.2d 355. Nonetheless our Supreme Court has steadfastly approved the standard set out in Instruction No. V, measuring the damage by the pecuniary loss to the parents resulting from the wrongful death.

The basis of these decisions is our state statute in which our legislature provided that in wrongful death actions " * * * the jury may give * * * such damages * * * as the jury may deem fair and just for the death and loss thus occasioned, with reference to the necessary injury resulting from such death, and having regard for the mitigating or aggravating circumstances attending the wrongful act, neglect or default resulting in such death." Section 537.090 RSMo 1959, V.A.M.S.

Of this statute our Supreme Court in Hertz v. McDowell, 358 Mo. 383, 214 S.W. 2d 546, 550 said, "The legislative intent * * * is to give the jury a broad discretion in computing damages for wrongful death, within the limit prescribed, based upon the pecuniary loss of every kind and character which, under all the circumstances of the particular case, would necessarily result from the death, to those entitled to recover (and the jury, in a proper case, may also diminish or increase the amount because of circumstances which they may find in mitigation or aggravation of the wrongful act, neglect, or default which caused the death)", citing Steger v. Meehan, Mo.Sup., 63 S.W.2d 109; Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S.W.2d 115.

The funeral bill was approximately $960. Butch was earning $80 a month and room and board during the summer period at the time of his death. Additionally, Butch had some business-farm activity and interests of his own. He owned several cows and some heifers which he kept on his father's farm. His father farmed between 250 and 300 acres and Butch contributed to the family operation and aided his father in farming that farm land. Butch was contributing to the cattle and livestock his father had, and also working around the farm when he wasn't working for someone else. His father testified that as soon as Butch got out of school the following spring "he was going in 50-50 with me". Butch was going to be a partner with his father in the farm operation. Butch spent his money "on livestock and things getting him lined out so he could be in partnership". His father had to employ other help to fill in for Butch when he was employed elsewhere and to date that totaled $400. Neighbors employed Butch from time to time when he was available for extra work and as one stated "he was always busy and I hired him when I could". It was admitted by appellant at the trial that Butch was a "good hard-working, thrifty boy".

Based on this evidence and keeping in mind that it was the expressed intent of the legislature that the jury and not the trial or appellate court should fix the amount of the award, we are unwilling to disturb it. We do not believe that on this record we can say as a matter of law that the verdict is excessive. Cf. Brewer v. Rowe, 363 Mo. 592, 252 S.W.2d 372, 377; Shepard v. Harris, Mo.Sup., 329 S.W.2d 1.

After having considered all the matters presented, and having found no prejudicial error, we affirmed the judgment.

All concur.